# EXHIBIT A

# THE APPRENTICE

## that never was

PRIVATE ATTORNEY GENERAL ACTION

## <u>THE APPRENTICE</u> that never was

## I.   PRELUDE

**Lincoln**

The relief sought from you, the reader, was first identified in the last speech Lincoln ever made, three days before Lincoln's assassination. It was two days after the surrender of Robert E. Lee's army to Grant, ending the Civil War, to a crowd gathered outside the White House calling for President Lincoln, reporter Noah Brooks wrote, "Outside was a vast sea of faces, illuminated by the lights that burned in the festal array of the White House, and stretching far out into the misty darkness. It was a silent, intent, and perhaps surprised, multitude." "Within stood the tall, gaunt figure of the President, deeply thoughtful, intent upon the elucidation of the generous policy which should be pursued toward the South. That this was not the sort of speech which the multitude had expected is tolerably certain."

Lincoln stood at the window over the building's main north door while Brooks held a light so Lincoln could read his speech.

The Lincoln speech of April 11, 1865:

"We meet this evening, not in sorrow, but in gladness of heart . . . . . . .

This plan was, in advance, submitted to the then Cabinet, and distinctly approved by every member of it. One of them suggested that I should then, and in that connection, apply the Emancipation Proclamation to the theretofore excepted parts of Virginia and Louisiana; ***that I should drop the suggestion about apprenticeship for freed-people,*** and that I should omit the protest against my own power, in regard to the admission of members to Congress; but even he approved every part and parcel of the plan which has since been employed or touched by the action of Louisiana. ***The new constitution of Louisiana, declaring emancipation for the whole State, practically applies the Proclamation to the part previously excepted. It does not adopt apprenticeship for freed-people***

. . . . . . .

Again, if we reject Louisiana, we also reject one vote in favor of the proposed amendment to the national Constitution.

. . . . . . . " *(emphasis added)*

i

The dilemma Lincoln was facing was how to gradually eliminate inequality. Lincoln envisioned using apprenticeship as the Union was reconstructed. Lincoln recognized that freedom without the opportunity to earn a living would be disastrous and only lead to and did lead to misery. Lincoln's proposal occurred when Louisiana wanted to return to the Union. Lincoln identified apprenticeship for the freed-people as the tool to repair and bring the freed people into the mainstream of economic opportunity. Lincoln recognized that freed persons had to be provided skills as workers through apprenticeship to assimilate them into a working, earning and thriving class, without which there would be immense suffering and damages to the freed class.

The 10 minute speech of only 1819 words introducing the complex topic of reconstruction, twice identified apprenticeship for freed-people as a means to survive and prosper, as it was viewed through the prism of the State of Louisiana. Incensed John Wilkes Booth, a member of the audience that evening on April 11, 1865, vowed, Brooks wrote "That is the last speech he will make." An acknowledged white supremacist according to Brooks, Booth made good on his threat.

The assassination of Lincoln by Booth 3 days after this speech, frustrated the proposed reconstruction opportunities: "***apprenticeship for freed-people***", a vision not spoken of again since April 11, 1865. Instead, Lincoln's nightmare of disaster and misery came true with lynchings, massacres, and the anarchy of Reconstruction[1] followed by the Jim Crow laws of separation and discrimination[2]. Out of this cauldron of a beginning the 14th amendment grew to ensure equal opportunity to freed-people, enter Roscoe Conkling.

**Grant and Conkling**

Roscoe Conkling, US Congressman, and later US Senator from Utica New York, at a time when both US Senators from New York State were from Utica New York, the other Senator being Francis Kernan, Grant and

---

[1] Bibliography Manuscript research reference

[2] Bibliography Manuscript research reference

Conkling[3] enter the story. In 1865 Vice President Andrew Johnson became President and reconstruction of the south began. Conkling had previously been Lincoln's collaborator and supporter in Congress for freeing the enslaved people, and later a staunch supporter of President Grant's efforts. Conkling began work in earnest on the 13th, 14th and 15th amendments to the Constitution of the United States as a member of the Congressional drafting committee. Conkling's focus was on the 14th Amendment. Conkling understood the phrase "apprenticeship for freed-people" as a fundamental natural right to work, earn, live, and pursue happiness, full equal opportunity that should be afforded to all, including those as freed-people, natural rights of life, liberty and pursuit of happiness.

When Lincoln was assassinated, Conkling rose to the need to determine and assure that the Constitution protected these rights, which lead to the 14th amendment to the U.S. Constitution. Conkling was instrumental to not only implementing emancipation which was granted by the 13th Amendment, but also equal protection of the laws afforded to all persons by the 14th Amendment. The 14th Amendment, drafted by committee, was ratified in 1866. Conkling was a principal contributor on the Committee drafting the 14th Amendment and its equal protection and due process clauses.

Conkling tried to pursue the Lincoln vision, but the 10 years after Lincoln's assassination, the 10 years following Lincoln's vision of apprenticeship for freed people, were 10 years of anarchy and lawlessness which brought President Ulysses S. Grant and his close friend Conkling to utter frustration. Reconstruction was failing.

It was then that Senator Francis Kernan, on an Electoral Commission to settle the Presidential Election of 1876, cast a deciding vote to accomplishing the compromise of 1877 to preserve the Union, end Reconstruction, and bring the southern states behind a compromise presidential candidate - Rutherford B. Hayes[4]. Apprenticeship for freed people was lost, the apprenticeship plank of Reconstruction was abandoned

---

[3] Bibliography Manuscript research reference

[4] Bibliography manuscript research reference

in the compromise of 1877 which ended Reconstruction[5]. Conkling had declined a seat on the committee knowing what the outcome was sure to be – there would be an abandonment all efforts to provide equality. Conkling later became lost as a dark figure of graft and corruption at the New York City Customs House, finally dying in the blizzard of 1888 walking from his office at Wall Street to Union Square. A sorry end, Conkling had abandoned his moral compass[6].

Apprenticeship did not again resurface for the benefit of freed persons until the Percy Class sued in 1973 to eliminate discrimination in economic opportunity, eliminate segregation and eliminate disparate opportunity. The Percy v. Brennan lawsuit followed as a result of the civil rights movements of the 1960s. Percy as a Class now complains that if the Class had gotten what was long ago a vision called apprenticeship, a vision not fulfilled even 154 years later, the world would be a much different place today.

## Franklin Roosevelt

Apprenticeship was not formalized as a federally adopted structured program until the National Apprenticeship Act of 1937, and even then was not used as an opportunity to teach skills to disadvantaged persons.

In 1937, the Congress passed the National Apprenticeship Act (29 U.S.C. 50), also known as "the Fitzgerald Act." The Act established a national advisory committee whose task was to research and draft regulations to establish minimum standards for apprenticeship programs. The Act was later amended to permit the United States Department of Labor to issue regulations protecting the health, safety and general welfare of apprentices, and to encourage the use of contracts in the hiring and employment of them.

Much like FDR's Work Projects Administration (WPA), which put the unskilled to work building America's airports, schools, and highways, apprenticeship programs can once again train the unskilled to build today's infrastructure. The WPA maintained and increased working skills; and it

---

[5] Bibliography Manuscript research reference

[6] Bibliography Manuscript research reference

enabled the unskilled to take their rightful places in public or in private employment.

The Fitzgerald Act is administered by the Employment and Training Administration in the Department of Labor. Regulations banning racial, ethnic, religious, age and gender discrimination in apprenticeship programs are located at Title 29, CFR Part 30, but did little to foster affirmative action for equal employment.

Unfortunately, even though apprenticeship was formalized as a federally adopted structured program under the National Apprenticeship Act of 1937, it was not used as an opportunity to teach skills to disadvantaged persons.

## Lyndon B. Johnson

President Johnson is credited with the Civil Rights Act of 1964 and LBJ's Executive Order 11246.

The term affirmative action arose from Johnson's 1965 commencement speech at predominantly black Howard University when speaking about the adoption of the Civil Rights Act of 1964, President Johnson declared that equality has to be actual equality, not equality in name, when he said:

> "You do not take a man who, for years has been hobbled by chains, liberate him, bring him to the starting line of a race, saying you are free to compete with all the others, and still justly believe you have been completely fair. Thus, it is not enough to open the gates of opportunity. All our citizens must have the ability to walk through those gates. This is the next and the more profound stage of the battle for civil rights. We seek not just freedom but opportunity--not just legal equity but human ability--not just equality as a right and a theory, but equality as a fact and a result."

Equal opportunity at its core carries the simple mandate that opportunities should be open to all on the basis of competence alone. This complaint is that the Percy Class lacks the minimum training, skills and preparation needed to be eligible for the jobs that become available, and those who do secure work as a result of affirmative action mandates are

often unable to keep their jobs and the dignity of work.

Apprenticeship is the bedrock foundation upon which our country and freedom is based. Opportunity to gain basic work skills is necessary. But equal opportunity to gain skills doesn't exist in many instances, exposing unskilled workers and the public to unmanaged risk, one example is the recent virus pandemic and its rapid spread.

Apprenticeship, identified as affirmative action, is the natural right of all peoples because "The greatest wealth results from the greatest economic liberty, freedom of all individuals to work, save, buy, and earn at their pleasure, and economic life would settle into a natural order and productivity would thrive."[7]. A natural right identified in the Declaration of Independence, the US Constitution and the 14th Amendment to the US Constitution mandating equal protection of laws that affect these rights, Apprenticeship envisioned in Abraham Lincoln's forgotten last speech, from the balcony of the White House to a crowd gathered on the White House Lawn at the end of the Civil War, twice envisioning apprenticeship for freed people to gradually reconstruct the nation, yet in the 155 years since, not only has it not occurred, it has been thwarted by the Defendants.

## II.   EXIGENT CIRCUMSTANCES

Apprenticeship, foreseen by Lincoln 155 years ago as the way to restore our society, a large portion of society out of the economic mainstream, if we continue to fail to heed the Lincoln advice in the Prelude, the crisis will only get worse. Unpreparedness by the Percy Class by lack of skills and competency in all jobs and careers, will most certainly further endanger workers, especially first responders, the communities they serve and the general public.

The current, disturbing, almost outrageous national emergency has propelled this action. This historic crisis is made worse by lack of knowledge, skills and personal attributes needed to perform basic jobs well.

---

[7] The Wealth of Nations by Adam Smith, studied and emulated by Jefferson and the Franklin over two centuries ago

# Table of Contents

II.              PRELUDE ...................................................................................... i

Lincoln .................................................................................................................. i

Grant and Roscoe Conkling ........................................................................... ii

Franklin Roosevelt.......................................................................................... iv

Lyndon B. Johnson........................................................................................... v

III.            EXIGENT CIRCUMSTANCES................................................... vi

TABLE OF CONTENT ................................................................................... vii

IV.            COMPLAINT INTRODUCTION....................................................1

V.             PRIVATE ATTORNEY GENERAL ACTION ........................... 3

VI.            CLASS COUNSEL ....................................................................... 4

Percy has retained counsel experienced and qualified to bring this action ....................... 4

VII.           CLASS REPRESENTATIVE....................................................17

Percy as the Class Representative...............................................................17

VIII.          PARTIES ................................................................................... 18

PLAINTIFF:.......................................................................................................18

DEFENDANTS:................................................................................................. 18

IX.            BASIS OF THIS ACTION...................................................... 21

X.             PRIOR RECORD, CLASS STANDING ................................. 26

Precedent, Authority and Jurisdiction.....................................................26

XI.            PERCY, THE APPRENTICE that never was ........................28

XII.           ALTERNATIVE EMPLOYMENT PRACTICE ......................38

The Advocates ................................................................................................38

The Percy Program Presented by the Advocates as an Alternative Employment Practice under 42 USC 2000 e-2(k)(1)(A)(ii) and (k)(1)(C) meets the burden of production and persuasion under Title VII of the Civil Rights Act..........................................39

The Percy Program is a Less Discriminatory Alternative Method of Employment Practice Available to these Employers and Presented it the Defendant US Department of Labor and the Executive Branch Office of the President of the United States............................44

The Percy Program Presented to the NYS Empire State Development Corporation is an Available Less Discriminatory Alternative Method of Employment Practice .................45

The  Percy  Program  Presented  to  the  Port  Authority  of  New  York/New  Jersey  is  an

Available Less Discriminatory Alternative Method of Employment Practice ..................45

The Percy Program Presented to the Metropolitan Transportation Authority is an Available Less Discriminatory Alternative Method of Employment Practice ..................46

The Percy Program Presented to the New York Dormitory Authority is an Available Less Discriminatory Alternative Method of Employment Practice ..............................................46

The Percy Program Presented to the School Construction Authority is an Available Less Discriminatory Alternative Method of Employment Practice ..............................................46

The Percy Program Presented to the State University of New York is an Available Less Discriminatory Alternative Method of Employment Practice ..............................................47

The Percy Program Presented to the City Of New York and its Agencies is an Available Less Discriminatory Alternative Method of Employment Practice ....................................47

Percy Class as Third-Party Beneficiaries of Contracts .........................................................47

XIII.          DEFENDANT GOVERNOR OF THE STATE OF NEW YORK AND DEFENDANT STATE OFFERED A SETTLEMENT OF PERCY V. BRENNAN IN CASE 73-CV-04279 THAT IS UNENFORCEABLE AND FAILED ...........................................55

Defendant State and its Agencies, Actively Undermine the Percy Program.....................56

XIV.          DEFENDANT OFFICE OF FEDERAL CONTRACT COMPLIANCE ("OFCC") OF USDOL FAILS IN ITS RESPONSIBILITY OF DISCHARGING THE FUNCTIONS OF USDOL UNDER EO 11246 ....................................................................57

XV.          CAUSES OF ACTION AGAINST EMPLOYERS ...................................59

Defendant Employers have Violated and Continue to Violate 42 U.S.C. §2000e–2(k)(1)(A)(ii) and 2(k)(1)(C) ...........................................................................................59

XVI.          JURISDICTION AND VENUE ........................................................59

XVII.          THE PERCY PROGRAM.....................................................................60

History of Apprenticeship in the Percy Program .................................................................60

Worker Assessment ..................................................................................................................61

Hazards in the Workplace OSHA Application........................................................................62

OSHA 10 and 30 Hour Course ...............................................................................................73

OSHA 10 Confined Space Entry ............................................................................................73

OSHA Ergonomics....................................................................................................................74

OSHA Excavation, Trenching and Soil Mechanics .............................................................74

OSHA 7600 Disaster Site Worker..........................................................................................74

OSHA 2225 Respiratory Protection ......................................................................................75

OSHA 3110 Fall Arrest Systems .............................................................................................75

Fire Safety and Emergency Preparedness ............................................................ 75

American Heart Association First Aid, CPR with AED ....................................... 75

Enforcement of smoking prohibitions ................................................................ 76

Environmental Training Lead - Renovation, Repair and Painting Class ........................ 76

Mold and Bacteria Remediation ........................................................................ 76

Blood Borne Pathogens ..................................................................................... 76

Lead Worker EPA .............................................................................................. 76

Asbestos Handler ............................................................................................... 77

Apprentice Wages .............................................................................................. 77

XVIII.      COMPONENTS OF THE PERCY PROGRAM ................................... 77

XIX.      REGULATORY APPROVALS OF PERCY PROGRAM ...................... 81

XX.      NUMEROSITY ................................................................................ 85

XXI.      COMMON ISSUES OF LAW AND FACT ............................................. 86

XXII.      JUDICIAL ECONOMY.................................................................... 86

XXIII.      AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES.............................................................................. 87

XXIV.      AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES.............................................................................. 87

XXV.      AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES.............................................................................. 88

XXVI.      AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES and OFFICE OF FEDERAL CONTRACT COMPLIANCE 88

XXVII.      AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES.............................................................................. 89

XXVIII.      AS AND FOR A SIXTH CAUSE OF ACTION AGAINST ORISKA INSURANCE AND ORISKA CORPORATION ............................................................ 92

XXIX.      RELIEF ........................................................................................... 92

ix

UNITED STATES DISTRICT COURT for the
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALBERT E. PERCY,<br>                              *Plaintiff,*<br>-against-<br><br>ANDREW M. CUOMO as Governor of the State of New York; STATE OF NEW YORK; ROBERTA REARDON as Commissioner of the New York State Department of Labor); NEW YORK STATE DEPARTMENT OF LABOR; CRAIG E. LEEN as Director of the Office of Federal Contract Compliance, OFFICE OF FEDERAL CONTRACT COMPLIANCE;<br>                              *Defendants from SDNY* 73-cv-04279,<br><br>EUGENE SCALIA as United States Secretary of Labor; THE UNITED STATES DEPARTMENT OF LABOR; BUILDING AND CONSTRUCTION TRADES COUNCIL OF GREATER NEW YORK, NEW YORK BUILDING; AND CONSTRUCTION INDUSTRY BOARD OF URBAN AFFAIRS FUND, NEW YORK PLAN FOR TRAINING, INC.,<br>                              *nominal Defendants previously named as Defendants in SDNY* 73-cv-04279, *as their interests may now appear,*<br><br>JOHN MERCADO, MANUEL MEJIA, FIGHT BACK, and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br>                              *nominal Defendants previously named Plaintiffs in SDNY* 73-cv-04279, *as their interests may appear,*<br><br>ORISKA INSURANCE COMPANY and ORISKA CORPORATION,<br>                              *Defendants.* | **THE APPRENTICE that never was**<br><br><br><br><br><br>**COMPLAINT**<br>`<br>CASE#:<br><br><br><br>A PRIVATE ATTORNEY GENERAL ACTION |

Plaintiff, Albert E. Percy, by and through his attorney, James M. Kernan, Esq., of the Kernan Professional Group, LLP, as and for its

1

Complaint states as follows:

### III.   COMPLAINT INTRODUCTION

1. This Complaint is on behalf of Plaintiff Percy and the Class he represents. Procedurally, this class litigation is being commenced in the five boroughs ("Five Counties") of the City of New York, where Percy started his original action Percy v. Brennan 73-cv-04279. Building on that footing, seeking here to enforce the relief awarded to the Percy Class in Percy v. Brennan 73-cv-04279, is this plenary action as above captioned in the US District Court in the Eastern District of New York.

2. Armed with skills, able to be called upon to carry out emergency work activities, applying new ways and advances in technology, using sound judgement, demonstrating speed and accuracy needed to meet the needs of a crisis, increasing job complexity, challenges employers to recruit and retain a job-ready workforce.

   Now more than ever there is a desperate need to build skills necessary to protect the safety and well-being of frontline trusted workers in the unselfish work they are called upon to do for the communities and public they serve. This historic crisis is made worse by lack of knowledge, skills and competency in the workforce, a problem needing to be immediately addressed as described in this Complaint.

   As we stand now, we are not prepared.

3. This undertaking seems massive and profound, and it is, reference the **PRELUDE**. We have been probing, drilling and pile driving on behalf of Percy, deep into the history of affirmative action and equal employment opportunity to find out why it fails. Each time we think we have reached a solid foundation to build from, only to find we have not reached bedrock. Learning and adjusting we are now sitting on a solid foundation of Percy v. Brennan Case 73-cv-04279.

4. The lead cause of action in this Complaint is against defendant State of New York for failure of a settlement involving New York State Executive Order 45 (9 NYCRR 3.45) ("EO 45"). This action is grounded upon the final and enforceable Memorandum/Order ("Memorandum/Order") of Judge Lasker reported at 384 F Supp 800 of November 8, 1974, settled by agreement

accepting Defendant New York State's offer of EO 45. The problem is that EO 45 failed, and the Percy Class was never notified (paragraph 219 - 224).

5.  The causes of actions against each employer ("Employer(s)") identified in tag-along actions, involve the liability of each Employer for unlawful employment practices of discrimination where the Plaintiff is able to meet its burden of production and persuasion proving that there was a less discriminatory alternative method of employment practice available that the Employer could have adopted, failing to adopt the alternative employment practice without valid justification is an unlawful employment practice violating 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (k)(1)(C) of the Civil Rights Act of 1964 as amended in 1991.

6.  Moreover, an Employer with contracts receiving federal funding, liability of such an Employer is for breach of contract where such Employer has breached contractual conditions requiring compliance with Presidential Executive Order 11246 ("EO 11246"). Members of the Percy Class are beneficiaries identified in contracts as conditions and obligations where Federal Funding ("Federal Funding") is involved.

7.  This action enforces an alternative employment practice ("**XI. ALTERNATIVE EMPLOYMENT PRACTICE**" paragraphs 153 - 181 of this Complaint), on behalf of the Percy Class.

8.  Damages to the Percy Class for lost wages, for lost opportunity compensation, damages also affecting members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, not able to compete for jobs and employment based on skills and not by mark of the color of a person's skin or ethnicity.

## IV.   PRIVATE ATTORNEY GENERAL ACTION

9.  This action is brought as a private attorney general action as permitted by 42 U.S.C. 1988, to enforce certain federal laws, contracts, commitments, obligations and covenants to provide affirmative action for equal employment to correct disparate impact, low wages with few fringe benefits, minimal levels of training, and the lack of a career ladder, contributing to a chronic workforce shortfall, being caused by the neglectful use of Federal Funding thereby impacting not only the Percy Class and safeguarding the

welfare of apprentice workers, but as well the general public good. The New York State Department of Law and the US Department of Justice have failed to move against the Defendant Government Agencies, Owners and Employers, as hereinafter set forth.

## V.   CLASS COUNSEL

**Percy has retained counsel particularly experienced and qualified to bring this action**

10. I, James M. Kernan, speak in the first person as the attorney bringing this action, aided by the Advocates identified at paragraph 153 hereof, on behalf of the Percy Class as a private attorney general action.

11. I first became involved in the issues herein in 1978 when I was recruited to provide assistance in the preparation of affirmative action apprenticeship training to address the Percy v. Brennan Case 73-cv-04279.

12. My experience with the subject of apprenticeship training began in 1968 when, subject to the lottery draft, I enlisted in the US Marine Corps and reported to the Parris Island Recruit Depot assigned to Platoon 1039 for boot camp basic training, graduated on December 8, 1968 and reported for infantry training at Camp Lejeune North Carolina.

13. I received advanced infantry training at Camp Lejeune/Camp Geiger North Carolina and ordinance ammunition training at Quantico Virginia. Based on competitive testing I was offered an appointment as a Midshipman in the US Navy pursuant to Title 10 §2107 of the US Code for commissioning as a Second Lieutenant in the US Marine Corps trained for field combat engineering.

14. I accepted and reported to the Navy Department's attachment at Rensselaer Polytechnic Institute (RPI) for engineering training, which would change my MOS from 2311 Ordnance to 3102 Combat Engineer Officer.

15. Orders were in preparation for me to report to the First Marine Combat Engineering Battalion of the First Marine Division for permanent duty station Pendleton, California upon being commissioned as a Second Lieutenant, for processing and deployment as engineering reinforcements to South Vietnam. Then, in the early months of 1971, enemy engagement

ceased and the US withdrew from South Vietnam, combat engineering strength went from more than 20,000 to by May 1971 of less than 1000. On May 24, 1971 the First Marine Combat Engineer Battalion withdrew from South Vietnam and shipped back to Pendleton, California. The last Marine Corps ground action in Vietnam was in May 1971. The withdrawal which began on January 1, 1971 was complete by the end of May 1971. This was at the same time that anti-war protests were reaching their peak and on June 13, 1971 the Pentagon Papers began to be published by the New York Times.

16. When Field combat engineers were no longer needed in South Vietnam, preparations for my deployment ceased. Instead I was offered the option of a duty station stateside or I could decline the commission and retire from military service. On June 21, 1971, I volunteered to forego the commission and retire. My discharge rating on a scale of 1 to 10, was scored 9 on intelligence, with a "Highly Recommended" "evaluation to be considered in the future for determination of acceptability for other officer training", with remark pertaining to the evaluation that "Kernan has demonstrated excellent potential for leadership".

17. On July 8, 1971 I was released from duty by the Department of the Navy and with my DD214 Honorable Discharge from enlisted ranks of the US Marine Corps, I mustered out. I put my uniforms in mothballs and put my military service behind me; it was a single line on my resume. In those days from 1968 to 1971 it was not cool to be in the military, the un-welcome to Vietnam era vets. I now have a renewed pride in having served honorably as a United States Marine. I have become a member of the American Legion, Vietnam Veterans of America, the Marine Corps League and the Commander of the Battle of Oriskany Masonic War Vets, regaining pride in my military service.

18. I did not then recognize that my military service was the underpinning for what has become Percy Jobs to Careers. In civilian life over the next 40 years, I have put my military experience and training to use with Percy Jobs to Careers.

19. I left military service returning to civilian life as a veteran trained as a combat engineer in demolition, explosives and ordnance, skilled in civil and mechanical trades for demolition support, field construction of machinery, structures, systems and controls. I took a civilian job as a field explosive

demolition engineer supervising blasting and drilling crews. After working in the field, I was transferred to the main headquarters of Hercules Inc., a chemical and explosives manufacturer formerly affiliated with DuPont, located in Wilmington, Delaware.

20. I completed my BS degree in mechanical with civil engineering from Rensselaer Polytechnic Institute in 1972. I was promoted in 1974 to Senior Engineer at Hercules, Inc. I served four-years as an engineer-in-training apprentice with advanced placement for military service and training in civilian work, enabling me to sit for the engineer-and-training and professional engineering exams simultaneously, and upon testing in 1976 became licensed as a Professional Engineer in Delaware and New York.

21. While working for Hercules, I attended night law school, completing in 1976. I sat for the New York bar exam and was admitted to the practice of law in New York in 1977.

22. When I was recruited in 1978 to consult on benefits with the Percy attorney Dennis R. Yeager Esq., now deceased, I worked with the team pursuing an apprenticeship program based on a 1974 award by Judge Lasker of the Federal District Court for the Southern District of New York, which required affirmative action for equal employment opportunity by apprenticeship training in enforcing Presidential EO 11246, a class action brought by Albert Percy, Class Representative for the Percy Class. My role was to provide technical research on apprenticeship needed to implement the award by Judge Lasker.

23. In 1979, I was recruited as a junior attorney by Judge Walter F. Bliss, retired Judge of the Third Department Appellate Division New York State Supreme Court, the designated appellate court considered expert on Workers' Compensation issues. In 1981, after the conclusion of the Percy v. Brennan Case 73-cv-04279, an adverse decision was issued by the Appellate Division Fourth Department of the New York State Supreme Court in a case brought by the New York State Department of Labor against Lancaster Development, Inc., Madden Construction, Inc., and Eastern Rock Products, Inc. The Lancaster decision, Lancaster Development, Inc. v. Ross 82 A.D.2d 1013, identified the need for a framework to provide employee benefits, including apprenticeship, to meet supplemental wage benefit requirements in

compliance with the New York State Labor Law §220 and the federal Davis-Bacon Act 40 USC §§276a to 276a-5. We undertook to develop a plan to fit the framework required of Percy v. Brennan.

24. With my knowledge of trade skills, I developed OJT apprenticeship to meet the affirmative action demands of case of Percy v. Brennan within the framework of the Federal Davis Bacon Act of 1931, the Apprenticeship Act of 1937, and New York State Labor Law.

25. This became the Percy Program (paragraphs 241 – 274, paragraphs 275 – 276, and paragraph 275 – 280 of this Complaint) providing benefit programs in compliance with the US Davis-Bacon Act (40 USC §§276a to 276a-5) and Article 8 of the New York State Labor Law, providing 24 hours of protection for health, disability, medical care and lost wages, encouraging workers to stay with their employer. The Percy Program fosters depth of experience and skill in the workforce.

26. I continued on a career path which began with OJT apprenticeship, advancing to a career where I founded Percy Jobs to Careers, creating a pathway for anyone to advance, which includes rewarding skilled trades, advancement to business ownership and beyond, an individual's choice.

27. My career path was as a junior attorney with skills in the crafts and professional engineering, developing OJT apprenticeship to meet the demands of affirmative action of the case of Percy v. Brennan, eventually becoming Percy Jobs to Careers Apprenticeship Training 501(c)(3) non-profit entity and the entities and facilities described as the Percy Program.

28. For 40 years I have been involved with Apprenticeship under the National Apprenticeship Act of 1937. Apprenticeship under the National Apprenticeship Act of 1937 can occur by three methods: (1) through a joint apprenticeship labor-management counsel involving unions, (2) by sponsorship by an employer, or (3) by sponsorship by a trade association.

29. I have developed Apprenticeship for various occupations through a trade association and by individual employer sponsors, involving learning a skilled occupation through both on-the-job training (practical, paid experience) and learning the related technical knowledge in a classroom (related classroom). The Percy Program which included apprenticeship was

developed to address the Percy vs Brennan decision and the adverse Lancaster decision and to provide affirmative action that would benefit employees on public work projects and it was submitted for approval to the Defendant United States Department of Labor.

30. By a letter of direction to me of June 14, 1984, the United States Department of Labor, Employment Standards Administration Wage and Hour Division advised that the provisions of the Program and their accompanying trust and adoption agreements were reviewed and it was the opinion of the United States Department of Labor that they qualified as "bona fide" fringe benefit plans within the meaning of the Davis-Bacon Act and the applicable regulations of 29 CFR Part 5. That craft apprenticeship for workers training to attain journeyman status was allowed to be offset against the fringe benefit requirements only if the US Bureau of Apprenticeship and Training (BAT) or the appropriate State apprenticeship council recognized by BAT has approved the apprenticeship program.

31. I have represented the Percy Class in presenting an Alternative Employment Practice, now as the complaining party under 42 U.S.C. § 2000e–2(k)(1)(A)(ii), meeting the Plaintiff's burden of persuasion as the requisite demonstration described in subparagraph (C) as required by 42 U.S.C. § 2000e–2(k)(1)(A)(ii).

32. I chartered Oriska Insurance Company ("Oriska") and obtained licenses to write workers' compensation insurance, health and disability coverage with deductible loss sensitive provisions, along with Fidelity & Surety Bonding, the Percy Program. In fact, Oriska is the only carrier in the country with the licenses and authority to offer the Percy Program, Oriska Insurance Company was chartered in 1990 and received licenses in 1993 for the following lines of business: Health & Disability, Workers' Compensation, Fidelity & Surety Bonding, and Credit Unemployment Insurance, along with additional miscellaneous licenses.

33. On January 25, 1991, I obtained association approval for Oriska Corporation as an apprenticeship sponsor under regulation [part 601] and Article 23 of the New York State Labor Law, qualified under the 1937 National Apprenticeship Act section 1 (29 U.S.C. 50) under U.S. Department of Labor's Bureau of Apprenticeship and Training (BAT) and C.F.R.T. 29, Subt.

8

A, Pt. 29 and Pt. 30. (the Fitzgerald Act). Registration of the Percy Apprenticeship Program under the regulation 12 N.Y.C.R.R. 601.8 that existed when the Oriska Corporation program was registered, remains in full force and effect

34. In 1991 I established apprenticeship programs as an Alternative Employment Practice to be provided with workers' compensation insurance coverage as part of risk-management and loss control by the insurance carrier. All employment is covered by workers' compensation insurance. The Alternative Employment Practice set forth herein at (**XI. ALTERNATIVE EMPLOYMENT PRACTICE**" paragraphs 153 – 218, **(XVI. THE PERCY PROGRAM,** paragraphs 241 – 274, **XVII. COMPONENTS OF PERCY PROGRAM** paragraphs 275 – 276, **XVIII. REGULATORY APPROVALS OF PERCY PROGRAM** paragraph 277 – 280 of this Complaint), of this Complaint, incorporates apprenticeship training into the workers' compensation insurance risk management, loss control and safety training of employees, by enrolling new entrants to the workforce to work alongside existing journeypersons, growing the depth of skilled workers, skilled workers whose ranks are being diminished through age and attrition. The workers' compensation carrier subsidizes the apprenticeship programs by recognizing the savings in reduction of losses which reduces the exposures and liabilities of the claims required to be paid by the workers' compensation insurance carrier.

35. I developed work processes for on-the-job training and related classroom instruction for skilled trades: carpenter, heating, ventilating and air conditioning, plumber, steam fitter, mason, steelworker, roofer, operating engineer, electrician, and skilled laborer. In development are personal care, health care workers, nurse aide, activity director, dining services, environmental services, home health aide, rehabilitative aide, medication aide, hospital maintenance worker, emergency medical technician, firefighters and other first responders, the list is virtually unlimited and supported by the library of the United States Department of Labor and the Library of Congress.

36. This Alternative Employment Practice gives the Percy Class an opportunity to compete for employment based on skills rather than the color of one's

skin or ethnicity. This Alternative Employment Practice was proposed by the Percy Class to the Defendant Government Agencies, paragraphs 172 – 181 of this Complaint.

37. Such apprenticeship includes on-the-job ("OJT") training working alongside an experienced craft person who is able and willing to transfer their know-how to inexperienced, although enthusiastic apprentices as the apprentice learns by doing the tasks of the craft. An acceptable apprenticeship program is vigorous and comprehensive and takes many years for an apprentice to fulfill the requirements as established by Defendants EUGENE SCALIA, Secretary of Labor, THE UNITED STATES DEPARTMENT OF LABOR through its US Bureau of Apprenticeship Training, ROBERTA REARDON, Commissioner, NEW YORK STATE DEPARTMENT OF LABOR, NEW YORK STATE DEPARTMENT OF LABOR, as delegated to the New York State Department of Labor.

38. I received a designation as an Associate in Fidelity & Surety Bonding by the Chartered Property and Casualty Insurance Underwriters Society. I also was a confidential law clerk to New York State Supreme Court Justice John R. Tenney, sat as Village Justice for the Village of Oriskany, NY, sat as acting City Court Judge in the City of Utica, NY, and was on the panel of arbitrators of the American Arbitration Association.

39. I have been a certified risk control and return-to-work specialist under New York State Department of Labor Industrial Code Rule 59 & 60 since 1997. I analyzed risk exposure for employer business operations, reporting, and recommending methods to reduce exposure with follow-up verifying implementation.

40. In 1999, I was appointed by the Commissioner of the New York State Department of Labor to the Apprenticeship Training Task Force to establish guidelines for classroom instruction in the skilled trades, representing disadvantaged persons in relation to apprenticeship and bonding.

41. I was appointed by former US Secretary of Labor Alexis M. Herman as a member of ERISA §3(40) Negotiated Rulemaking Advisory Committee, for the first rulemaking undertaken by the United States Department of Labor Pension & Welfare Benefits Administration. I was awarded a commendation

by Secretary of Labor Herman in April 2000 for my two years of voluntary pro bono work on the Rulemaking Committee, which ultimately resulted in the publication of the ERISA §3(40) Rule.

42. As early as 1994, through the specialized, flexible multi-line property and casualty company, Oriska Insurance Company, I initiated a successful bonding program guaranteed by the US Department of Transportation and the US Small Business Administration which ran from 1998 through 2002 for independent entrepreneurs, minorities, women, and small and disadvantaged business enterprises.

43. A Judgment ("Judgment") of December 14, 2007 of the New York State Supreme Court Oneida County against the State of New York in favor of Oriska, in case CA2006-001542 based upon a Stipulation ("Stipulation") in open court of December 10, 2007, provides relief to the Percy Class.

44. The litigation involving State agency New York Department of Financial Services ("DFS") and Oriska resulted in a settlement on December 14, 2007 before the Hon. Robert Julian where it was stipulated in open Court, pursuant to CPLR §2104, that the dispute between Oriska and the DFS was a matter of statutory accounting and that Oriska's accounting was acceptable and the Department agreed not to pursue any further actions or proceedings against Oriska based upon an alleged insolvency. Most important is that Judge Julian found (and the State agreed and stipulated on the record) that "the superintendent has not determined and has not alleged that the current management of Oriska in untrustworthy or dishonest." The Action for Receivership of Oriska was dismissed with prejudice.

45. The State is bound by the Stipulation establishing credit to be allowed Oriska in accordance with Regulation 11 NYCRR 176 which adopted the Statement of Statutory Accounting Principles ("SSAPs") into law in New York and in particular SSAP 65 paragraphs 34-39. The multiple-coordinated policies under the Percy Program as set forth in the 1994 Approval by the DFS, updated at the time of the Stipulation and Judgment to the 2007 approval by the DFS of Endorsement WC990602(11/07)NY referenced in the Stipulation, is binding on the State under the Stipulation.

46. A Report of Examination of Oriska Insurance Company of June 15, 2012 (the "Report") issued from DFS again alleged that Oriska was insolvent.

47. The issue of trustworthiness of management of Oriska, as raised at page 12 of the Report, was resolved and settled by the Stipulation and Judgment as set forth on at page 3 of the transcript that there was "no dishonesty or untrustworthiness" on the part of management of Oriska.

48. The Stipulation of accord and settlement on the record before the Court by the State and Oriska, is based on the Percy Program and is enforceable under CPLR 2104.

49. The Percy Program as an Alternative Employment Practice under the Civil Rights Act was developed specifically to address EO 11246, and it is intact and viable. Nevertheless, neither Percy nor other members of the Percy Class received or are receiving the relief contemplated by Judge Lasker in his decision of November 4, 1974. It is irrational and illogical to just assume that a business which is owned by a minority will, when awarded contracts as a goal, will then out of the goodness of their heart hire their ilk. No, even they want to hire skilled workers able to make their businesses profitable. Hiring is because of a person's skills and capability, not because of the color of a person's skin or their ethnicity.

50. Technicians must be able to use the tools necessary in order to yield the best results in relation to the skilled crafts. This can only happen by having the best trained craftsman with specialized skills, training and experience in the industry. Specialized personnel, required to work in extreme and often isolated work conditions and locations must maintain safety and responsibility under harsh conditions and must be able to use material, equipment and innovation in planning and organizing. Trained personnel, materials and equipment are necessary to maintain facilities relied on by the general public for basic everyday needs of clean water, sewage treatment and electrical power distribution. Trained personnel must be knowledgeable in safely using structural materials to deliver those utilities by pipe, conduit, component parts, pumps, controls, belts, and knowledgeable in the mechanics of materials and methods utilizing pressurized systems and pneumatic tools, exposed to blood borne pathogens and virulent viruses now of great concern.

51. There are a wide variety of specialized jobs in many diverse industries requiring highly skilled employees, dependent on the ability of members of a team to properly produce results with a qualified team of technicians, mechanics, and engineers.

52. Working on a team under special circumstances alongside an experienced journeyman, an apprentice finds out what it takes to get the job done and move up in rank to more sophisticated and higher-paying jobs, possibly eventually becoming supervisors, owners of businesses or industry leaders as a result of their valued experience.

53. Everyone starts out at the bottom of the ladder in a scale of pay commensurate with entry level positions, experiencing all the duties and responsibilities beginning with the basics of cleaning up and setting up for work processes. There are long work hours and the work is generally hard but the pay is good starting out. Then, with the proper training, promotion to higher-paying and more responsible positions, which occurred for me in a relatively short period of time.

54. Mechanical tasks are needed to take care of equipment and facilities, checking for faults and leaks in pipes and fittings, using manual wrenches, compressed air tools and installing, starting up, repairing and maintaining pump and engine parts that are needed to service the utilities which the public relies upon, but take for granted. All of the jobs work as teams or with experienced craft persons. Even an entry-level worker must have good knowledge of mechanical systems, be skilled at working with hand and power tools, as well as able to repair any tool that breaks. Training in safety protocols and emergency procedures is an absolute must. Knowing how all equipment and systems work and the importance of knowing production methods is essential, along with the ability to check and maintain systems and machinery daily, while on the job, for upkeep and maintenance.

55. Many jobs depend on the way that teams are set up under the supervision of a skilled journeyperson, manager or tool-pusher. Responsibilities include getting the work done safely, efficiently and within regulations set down by government and company authorities. The work requires excellent organizational skills, communication and listening skills to be capable of working quickly with an eye for detail. A worker who is new to a worksite

and facility must be able to work well with others in order to develop good teams capable of working efficiently together, and to sort out which teams are not working to the best capacity as a team.

56. The workers and members of the team must be responsible for operations, hoisting equipment and managing the work floor, which may include breaks, monitors, throttles for equipment, measurements, reading and other feedback from equipment to allow adjustments to be made and tuned as they become necessary. A supervisor or journeyperson working with new recruits must assure that the team is aware of the safety measures and that all are followed to the letter, with regular safety drills and meetings being scheduled by a foreman or supervisor for all personnel, to make sure that the rules are being closely monitored and followed.

57. A supervisor is a journeyperson who oversees the entire operation who started out low on the ladder before graduating through the hierarchy of the team, starting out as a trainee apprentice learning about the trade in a classroom and on-site. The experience is accomplished under the watchful eye of a journeyperson trainer. After learning the basics of the trade, workers can move up to positions with more duties, responsibilities and pay, taking on more specialized duties on the job site which require additional training and certification in particular fields of specialized trades, becoming a qualified member of a work team.

58. A dependable and smooth-running group of teams is created by having craftsman who have learned their job by coming up through the ranks. Constraints and vigorous apprenticeship training provide the level of experience that a worker can draw from, while handling the many responsibilities of the team and honing superior leadership skills while on-the-job.

59. Managerial skills require precise organizational practices with a background of courses and related classroom instruction, which include safety, management and organizational skills as well as ongoing training throughout the career to keep abreast and maintain knowledge of new equipment, systems, safety and regulatory changes, first-aid, fall protection, dangerous conditions, infectious diseases, hazardous materials, rescue and other training courses needed.

60. There are many paths of advancement, but a person must be on-the-job in order to obtain the necessary skills for advancement.

61. The work requires that the craft person be physically fit and have a strong work ethic which allows continuation until a job is done, not quitting halfway through. The public are relying upon basic utility systems and the workers who maintain them to be capable of doing the work and undertaking these important duties. They must be able to work outdoors and in inclement conditions for long periods of time, regardless of weather conditions where the work is hard, but the compensation is worth the effort. Workers must be capable to control, listen, maintain, check regularly for vibration and other operational problems and keep equipment in good repair, inspecting all aspects of their operation while helping out with training new team-members.

62. Industries have many diverse fields of experience that constantly require an influx of trained and experienced personnel to help keep industries going.

63. Today there is an obvious shortage of skilled labor. If the Percy Class had received the promised apprenticeship, people who need jobs today would have the skills to compete for rewarding and good paying jobs.

64. Today, Percy continues as the class representative to develop skilled persons trained and capable of keeping society's infrastructure functioning. This cannot happen without the educated, skilled, salt of the earth, labor of hardworking Americans. But nothing is possible without proper training and safety.

65. This action has been brought on behalf of similarly situated persons alleging that Government Agencies and authorities, Owners and Employers, in violation of various statutory and common laws, failed to implement the regulations and executive orders which guarantee the right to equal employment opportunities under the Civil Rights Act of 1964 and as amended in 1991, when presented with a demonstrated Alternative Employment Practice which the Employers and Owners failed to adopt.

66. Now the Percy Class as the "complaining party" produces and persuades to demonstrate an Alternative Employment Practice, paragraphs 153 et seq of this Complaint, by providing fully compliant apprenticeship meeting the

requirements of the National Apprenticeship Act of 1937, incorporating OJT apprenticeship into workers' compensation insurance safety, risk management and loss control as the vehicle to alleviate disparate impact. This is the Alternative Employment Practice.

67. The skilled trades are in constant need of new and experienced personnel able to handle the many changing aspects of the industry where the range of experience required for workers is always evolving. Continuing education will allow employees to be trained and be up-to-date on new equipment and methods and to be able to handle the day-to-day operations that all depend upon.

68. As recited above, the Percy Program was chartered in 1990 and received licenses in 1993 for the following lines of business: Health & Disability, Workers Compensation, and Fidelity & Surety Bonding.

69. The Program provides surety bonds for independent entrepreneurs, small and disadvantaged business enterprises and provides for mentoring of each of the independent entrepreneurs it writes for whom it writes a bond, considering the human aspect of work product, job performance and growth through performance as has been and will continue to be fostered and mentored through the unique Percy Program.

70. Carl Evans with Irving Hurdle, Webster Gillory, Walter Fauntroy, Roger Edmunds, Anthony Robinson, and Lynette Barnhardt, and myself as counsel to Percy (the "Advocates" referred to at paragraphs 153 - 154 hereof), comprised a team working presenting the Alternative Employment Practice to the Defendants, all to no avail because the Defendant Government Agencies and authorities have refused the plight of the Percy Class, frustrating the Alternative Employment Practice, failing to enforce EO 11246 and the mandates of the Civil Rights Act.

71. I am working with the Minority Business Enterprise Legal Defense & Education Fund ("MBELDEF"), an organization that seeks to protect the civil rights of disadvantaged persons, including the right to equal employment opportunity, and they as well as I am experienced in this type of litigation brought by the Percy Class.

72. We (myself as Class Counsel, the Advocates and the Percy Class) seek declaratory. injunctive and monetary relief so as to be able to compete fairly for jobs based on ability, rather than skin color or ethnicity.

73. We bring this action to compel the adoption of the proposed Alternative Employment Practice, of providing OJT apprenticeship training within workers' compensation insurance safety training, loss control, and risk management provided to Employers, made a part of workers' compensation coverage required of all employment on which EO 11246 and the Civil Rights Act of 1964, as amended in 1991, are applicable.

74. We bring this action seeking equitable relief to enforce the Alternative Employment Practice and we seek money damages in the tag-along actions identified at paragraphs 235 - 238 of this Complaint.

75. The Percy Class is represented by a legal team experienced in this struggle and competent in civil rights litigation. Despite spending over two decades fighting to defend and keep the viability of the entities, licensing, authority, and goodwill intact. Now we are ready to step forward once again, mature and wise having been tested and survived, with all of the tools still in force and viable that were developed to implement the relief to which the Percy Class is entitled.

## VI.    CLASS REPRESENTATIVE

**Percy as the Class Representative**

76. Plaintiff Albert E. Percy ("Percy") has and will fairly and adequately protect the interests of the members of the Class. Percy has no conflict of interest with the members of the Class.

Percy resides at 119-09 232 Street, Cambria Heights, NY 11411-2223, where he owns a residence and is an active registered voter in election district 70 in Queens. Percy is the Class Representative in the above captioned lawsuit Percy v. Brennan, 3 Civ. 4279; File # 41415384 (S.D.N.Y.) (filed 10/9/1973) (the "Percy Action") for the class of all black and Spanish-surnamed persons identified in Percy v. Brennan.

## VII.   PARTIES

### PLAINTIFF:

77. Plaintiff Albert E. Percy, ("Percy"), certified as the class representative of the certified class by Judge Lasker in the Memorandum/Order at 384 F Supp 800, page 811 [S.D.N.Y. 1974] in Case 73-cv-04279, Docket 99, Appendix 1[8], Volume 3, page 663 in 17-2273 (the "Percy Class"), a proper member of the Percy Class, was denied equal employment opportunities, and remains a proper representative of the Percy Class. Percy's personal and business interests and the claims hereinafter set forth are fully aligned with those of the Class.

### DEFENDANTS:

78. Defendant Andrew Mark Cuomo has succeeded Nelson A. Rockefeller as the Governor of the State of New York and, as such, is the chief executive officer of the State of New York and is charged with the duty of enforcing equal employment opportunity requirements applicable in the State of New York and is sued in his individual and official capacities.

The New York State Department of Financial Services is an agency of the executive branch of government of the State of New York under Governor Cuomo. On October 3, 2011, the State of New York created a new department, the Department of Financial Services, which assumed the responsibilities and authority of the former New York State Department of Insurance which had formerly been responsible for the regulation and oversight of insurance companies (referred to as the "DFS" in this Complaint).

---

[8] Three Appendices making up the Record on Appeal, Docket #99: 17-2273 are as follows:

Appendix 1, Volume 1-3, Docket #97-99, contains the documents certified by the National Archives as docketed in the original paper docket, ECF docket entry 1 in the Lower Court for Case 73-cv-04279;

Appendix 2, Volume 1-4, Docket #100-103 contains the remaining documents certified by the National Archives contained in the file for Case 73-cv-04279.

Appendix 3, Volume 1, Docket #104 contains 2017 documents in Case 73-cv-04279 and documents in Case 15-cv-03942 EDNY.

18

The New York State Department of Labor is an agency of the executive branch of government of the State of New York under Governor Cuomo, with Roberta Reardon as successor to Louis J. Levine as Commissioner.

The New York State Division of Human Rights is an agency of the executive branch of government of the State of New York under Governor Cuomo.

These State of New York parties are collectively referred to as the State or as the Government Agencies.

79. Defendant Eugene Scalia has succeeded Peter J. Brennan as the United States Secretary of Labor and, as such, is the chief executive official of the Defendant United States Department of Labor and is named as a nominal Defendant previously named as Defendants in SDNY 73-cv-04279 as their interests may appear here because it was a party to Case 73-cv-04279.

80. Defendant United States Department of Labor is the agency of the United States government that is charged with the duty of enforcing EO 11246, and is named as a nominal Defendant previously named as Defendants in SDNY 73-cv-04279 as their interests may appear here because it was a party to Case 73-cv-04279. The Department of Labor's Employment Standards Administration was dissolved and consequently the position of Assistant Secretary of Labor for Employment Standards no longer exists.

81. Defendant Building and Construction Trades Council of Greater New York, doing business at 71 West 23rd Street, Suite 501-03, New York, NY 10010, is an organization consisting of local affiliates of 15 national and international unions representing working men and women in New York City, and is named here as a nominal defendant previously named as Defendants in SDNY 73-cv-04279 as their interests may appear here as its interest may appear here because it was a party to Case 73-cv-04279.

82. Defendant Craig E. Leen is the Director of the Defendant Office of Federal Contract Compliance ("OFCC") of USDOL succeeding Phillip J. Davis, and, as such, is charged with the responsibility of discharging the functions of USDOL under EO 11246 and is sued in his individual and official capacities. Defendant OFCC is the Office of the USDOL that has responsibility for enforcing EO 11246.

19

83. Defendant New York Building and Construction Industry Board of Urban Affairs Fund, referenced in Case 73-cv-04279 as a Defendant, no longer in existence, was an organization established by building and construction trade unions. Most, if not all of its members are also members of the Defendant Building and Construction Trades Council of Greater New York, and is named as a nominal Defendant previously named as Defendants in SDNY 73-cv-04279 as their interests may appear here because it was a party to Case 73-cv-04279.

84. Defendant New York Plan for Training, Inc. referenced in Case 73-cv-04279 as a Plaintiff, is no longer in existence, and is named as a nominal Defendant previously named as Defendants in SDNY 73-cv-04279 as their interests may appear here because it was a party to Case 73-cv-04279.

85. Defendant the National Association for the Advancement of Colored People referenced in Case 73-cv-04279 as a Plaintiff, has its national headquarters at 4805 Mt. Hope Drive, Baltimore MD 21215, and is named as a nominal Defendant previously named as Defendants in SDNY 73-cv-04279 as their interests may appear here because it was a party to Case 73-cv-04279.

86. Defendant Manuel E. Mejia, now deceased, was a Spanish-surnamed citizen of the United States and a resident of the City of New York. He was a construction worker, fully competent to perform skilled construction work as an operating engineer, who was repeatedly denied the opportunity to perform that work by virtue of the discriminatory employment practices prevalent in the construction industry in the City of New York. Plaintiff Mejia was a named Plaintiff in the US Southern District of New York Case 73-cv-04279, Appendix 1, Volume 1, page 5, in the Docket on Appeal 17-2273 in Docket #97-104, and is named here as a nominal defendant as his interest may appear because he was a party to Case 73-cv-04279.

87. Defendant John Mercado, now deceased, was a Spanish-surnamed citizen of the United States and resident of the City of New York who was able-bodied, intelligent and fully capable of learning to perform skilled construction work. He was repeatedly denied the opportunity to perform such work by virtue of the discriminatory employment practices prevalent in the construction industry in the City of New York. Plaintiff Mercado was a named Plaintiff on the US Southern District of New York Case 73-cv-

20

04279, Appendix 1, Volume 1, page 5, in the Docket on Appeal 17-2273 in the United States Second Circuit Court of Appeals, Docket #97-104, and is named here as a nominal defendant as his interest may appear because he was a party to Case 73-cv-04279.

88. Defendant Oriska Insurance Company (also referred to herein as "OIC" and, "Oriska Insurance") was and still is a domestic corporation chartered and licensed by the State of New York as a Property and Casualty Insurance Company engaged in the sale and writing of workers' compensation, surety and fidelity bonding and health and disability insurance, maintaining offices at 129 South 8th Street, Brooklyn, New York. Defendant Oriska Corporation (also referred to herein as "OCorp") is a New York corporation which owns 100% of the issued and outstanding stock of OIC, does business at 6 Pennyfield Ave, Throggs Neck, Bronx County, New York. Oriska Insurance Company and Oriska Corporation are sued here as their interests may appear. OIC and OCorp also collectively referred to as "Oriska".

## VIII.    BASIS OF THIS ACTION

89. The lead cause of action in this Complaint is against defendant State of New York for failure of settlement involving New York State Executive Order 45 (9 NYCRR 3.45) ("EO 45"). This action is grounded upon the final and enforceable Memorandum/Order ("Memorandum/Order") of Judge Lasker reported at 384 F Supp 800 of November 8, 1974, settled by agreement on May 4, 1977 accepting Defendant New York State's offer of EO 45. The problem is that EO 45 failed, and the Percy Class was never notified, reference herein **XII DEFENDANT GOVERNOR OF THE STATE OF NEW YORK AND DEFENDANT STATE OFFERED A SETTLEMENT OF PERCY V. BRENNAN IN CASE 73-CV-04279 THAT IS UNENFORCEABLE AND FAILED.**

90. .The causes of actions against each employer ("Employer(s)") identified in separate related actions, involves the liability of each Employer for unlawful employment practices of discrimination where the Plaintiff is able to meet its burden of production and persuasion proving that there was a less discriminatory alternative method of employment practice available that the Employer could have adopted, failing to adopt the alternative employment practice without valid justification is an unlawful employment practice

21

violating 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (k)(1)(C) of the Civil Rights Act of 1964 as amended in 1991.

91. In addition, this action is for breach of contract brought by the Percy Class as third-party beneficiaries for violating conditions of contracts, including but not limited to EO 11246.

92. This action is on behalf of the Plaintiff Percy Class which has been disenfranchised and denied entry into paid on-the-job-apprentice training ("OJT") to be able to compete for employment on facilities and projects receiving Federal Funding to the Government Agencies, under the supervision of the nominal Defendants Eugene Scalia , Secretary Of Labor; The United States Department Of Labor; Craig E. Leen, Director; Office Of Federal Contract Compliance, in violation of the Civil Rights Act, and specifically 42 USCA §2000e-2 and §2000d as amended in 1991, and in breach of the conditions to contracts regarding Federal Funding from the United States of America, and of rights secured by the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§§1981, 1983 and 1985, and Executive Order ("EO") 11246 as provided for in contracts using the Federal Funding.

93. Owners and Government Agencies have merely passed the obligations through to Employers with goals ignoring the mandates of United States EO 11246, as well as several other federal regulations applicable to contracts involving Federal Funding, causing and continuing to cause disparate impact discrimination that these statutes, orders, and regulations were designed to remedy. It would be irrational and illogical to just assume that a business which is owned by a so-called minority will, out of the goodness of their heart, hire their ilk. No. Even they would want hire skilled workers able to make their businesses profitable. To expect a minority business enterprise will hire all minorities is illusory, it doesn't happen. Hiring is not because of the color of a person's skin, or their ethnicity, hiring in fact and reality must be by skills and capability. Defendant Government Agencies and Owners have been ambivalent, or have intentionally or unwittingly provided support to others yet to be identified and not named at this time, who have interfered and obstructed the Percy Program's1 sponsorship of OJT apprenticeship under the Fitzgerald Act (29 U.S.C. §50 commonly

known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Bureau of Apprenticeship and Training (BAT) and C.F.R. T. 29, Subt. A, Pt. 29 and Pt. 30.

94. Historically, the Percy Class has been locked out of the skilled trades. Without skills and safety training a person cannot progress from being unskilled, except by hands-on and rewarding OJT, to reach skilled occupational competence with opportunity of advancing. The members of the Percy Class have been and are ready, willing and able to work, persistently wanting to work, but have been constantly deprived and denied work, damaging the members of the Percy Class, and damaging the families of the members of the Percy Class, their children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a job, damages in an amount to be determined at trial.

95. The Defendants, individually and collectively, alone and in concert with other still unidentified parties, cloaking themselves with the mantle of public service, utilized and are still utilizing all the power of the Government Agencies, in a malevolent effort to deny the Percy Class an opportunity to compete safely and effectively within the American free enterprise system. By reason of the foregoing wrongdoings of the Defendants, Percy as a Class has sustained serious, irreparable, continuing damages.

96. This action is grounded by collateral estoppel by the Memorandum/Order ("Memorandum/Order") of Judge Lasker issued by the United States District Court for the Southern District of New York Case of Percy v Brennan Case 73-cv-04279, reported at 384 F Supp 800 of November 8, 1974 and set forth in the Docket on Appeal 17-2273 ECF Docket #99, Appendix 1, Volume 3 of 3, page numbered 640[9], and entered by Order thereon on February 24, 1975 in Case 73-cv-04279, Docket #99, Appendix 1, Volume 3, page 728 ("Order") and closed on May 4, 1977, Docket #99, Volume 3, page 740, the

---

[9] The documents are paginated in the lower right hand corner to correspond with DOCKETED NATIONAL ARCHIVES CERTIFIED DOCUMENTS DETAILED TABLE OF CONTENTS at the beginning of each appendix

Case 73-cv-04279 settled by agreement to accept Defendant New York State's offer of Executive Order 45 (9 NYCRR 3.45) (EO 45").

97. The Second Circuit Court of Appeals in Appeal 17-2273 established that Percy v. Brennan Case 73-cv-04279 in the United States District Court for the Southern District of New York, is final[10]. Here, Case 73-cv-04279 is now relied on for certifying the Percy Class, thereby determining the issue of standing and enforceability of EO 11426 and regulations and laws in relation thereto in favor of the Percy Class against the Defendants by collateral estoppel.

98. A prior proceeding when seeking to continue Percy v. Brennan in Federal District Court for the Southern District of New York, was made to the Federal Multi-District Panel. That process was interrupted as a result of a ruling by District Court Judge McMahon that Case 73-cv-04279 was no longer a case and controversy having been closed, and she instructed "There will be NO REOPENING of this case. If the plaintiffs or any party wishes to file a new case, go right ahead." docket #15 of 73-cv-04279. The Second Circuit Court of Appeals in Appeal 17-2273 affirmed that Percy v. Brennan Case 73-cv-04279, is final[11].

99. Tabulated and scheduled in tag-along actions are 13, 000 apprentice positions that should have been provided by the Employers totaling lost wages and benefits over $3 billion in and about the five New York City Counties since 2017. This Action begins with the five Counties of the City of New York, as the origin of this Class Action which began with Percy v. Brennan.

100. The Percy Program, reference herein **(XVI. THE PERCY PROGRAM,** paragraphs 241 – 274, **XVII. COMPONENTS OF PERCY PROGRAM** paragraphs 275 – 276, **XVIII. REGULATORY APPROVALS OF**

---

[10] **The** United States Second Circuit Court of Appeals in Appeal 17-2273 at docket #95 granted Appellants motion accepting the appendices in an appeal exploring whether Case 73-cv-04279 had been finally determined. The Appeal was dismissed at docket #138 in appeal 17-2273, establishing that the Memorandum/Order and Order were final.

[11] **The** United States Second Circuit Court of Appeals in Appeal 17-2273 at docket #95 granted Appellant's motion accepting the appendices in an appeal exploring whether Case 73-cv-04279 had been finally determined. The Appeal was

**PERCY PROGRAM** paragraph 277 – 280 of this Complaint), the Alternative Employment Practice, is delivered as a function of safety and training with workers' compensation under the covered payroll. The Percy Program as an Alternative Employment Practice functions as an element of a workers' compensation coverage. Registered apprenticeship in the Percy Program is a function of risk-management, safety training and loss control of workers' compensation insurance.

101. All employment is required to be covered by workers' compensation. Along with the payment of benefits to cover injury and death while on-the-job as required in under New York Workers' Compensation Law §10, workers' compensation coverage which includes registered apprenticeship with risk-management, safety training and loss control.

102. Workers' compensation coverage delivers the Alternative Employment Practice by providing apprenticeship for new hires and continuing education for existing employees. The Alternative Employment Practice provides skills to educate workers to competently and safely perform work, protect themselves and people with whom they come into contact. Too long employees have struggled without being provided the skills necessary to protect themselves and the communities they serve, including the general public with whom they come in contact.

103. The Percy Program does not require public funding. Properly run, the apprenticeship part of the program is funded by savings in workers' compensation costs resulting from safe work habits learned through registered apprenticeship, without extra cost to employers. This is accomplished by simply applying savings from reduced losses resulting from the Percy Program, and allocating those savings to pay for apprenticeship out of the premium paid for workers' compensation coverage.

104. This Alternative Employment Practice meets the burden of production and persuasion, demonstrated as set forth at paragraphs 153 – 218 hereof.

105. Yet, members of the Percy Class have been constantly denied access to apprenticeship to gain skills to compete for employment, breaching EO 11246. The Defendants the State of New York and its agencies under Andrew

Cuomo, Governor of the State of New York (hereinafter the "Government Agencies") violated and continue to violate the Memorandum/Order and Order by having failed to implement the settlement in Case 73-cv-04279, in harmony with the Civil Rights Act of 1964, and specifically 42 USCA §2000e-2 and §2000d as amended in 1991 (the "Civil Rights Act"), and in breach of Federal Funding conditions, and of rights secured by the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§§1981, 1983 and 1985.

## Precedent, Authority and Jurisdiction

106. This Complaint is based on the record in US SDNY Case 73-cv-04279, the case file archived as potentially of national significance in St. Louis, Missouri, the case file returned from St. Louis to the National archives in New York City, returned upon the request on behalf of Albert Percy, to and certified by the National Archives to the United States District Court for the Southern District of New York, which record was then filed by ECF as the Docket on Appeal to the United States Second Circuit Court of Appeals.

107. This action seeks to enforce the United States District Court for the Southern District of New York Order in the Case of Percy v Brennan Case 73-cv-04279 (the "Percy Action" or "Case 73-cv-04279" or "Percy v. Brennan") reported at (384 F Supp 800 [S.D.N.Y. 1974]), the Memorandum/Order, rendered by Judge Lasker on November 8, 1974 in favor of Percy Class, brought on behalf of disadvantaged persons seeking affirmative action in apprenticeship and employment in the New York construction industry.

108. A copy of the Amended Complaint in Case 73-cv-04279 is at Docket #97, Appendix 1, Volume 1, page 58, Docket 17-2273 in the United States Second Circuit Court of Appeals. The title of Case 73-cv-04279 was changed by the Second Circuit Court of Appeals pursuant to FRAP 43(c)(2) and Plaintiff Percy was ordered to revise all of its printing to reflect this changed title which was done at Docket #96-104 in 17-2273, replacing Rockefeller with Cuomo and Brennan with Scalia, as well as other public officials where a new person has succeeded them in office.

109. Standing was found by the Lasker Court in its Memorandum/Order stating the Percy Class has alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions" citing *Baker v Carr* (369 US 186, 204, 82 S Ct 691, 703, 7 L Ed 2d 663 [1962]); (*see Flast v Cohen*, 392 US 83, 101, 88 S Ct 1942, 20 L Ed 2d 947 [1968])". In Percy v. Brennan, black and Spanish-surnamed workers were alleged to "have been and continue to be denied employment in the New York construction industry, demonstrating the Percy Class continues to have a personal stake", 384 F Supp 800, page 808 [S.D.N.Y. 1974], 17-2273, Docket #99, Appendix 1, Volume 3, page 684.

110. The Memorandum/Order of Judge Lasker in the Percy Action, Percy v. Brennan, 384 F. Supp. 800, (S.D.N.Y. 1974), page 811 in 17-2273, Docket #99, Appendix 1, Volume 3, page 660, granted Plaintiffs motion to be maintained as a class and found standing to seek relief for the enforcement of EO 11246, as a class of persons that EO 11246 was designed to protect from injuries resulting from racial discrimination within the protections of the Fifth and Fourteenth Amendments to the Constitution, 42 USC 1981, and has met the requirements of subdivisions 2 and 3 of FRCP 23. See also, Docket #99, Appendix 1, Volume 3, page 653 in 17-2273.

111. The Class defined and certified by Judge Lasker in Case 73-cv-04279 was "all black and Spanish-surnamed persons who are capable of performing, or capable of learning to perform, construction work, and who wish to perform construction work within the jurisdiction of unions that are members of the Defendant Building and Construction Trades Council of Greater New York" with Plaintiff Albert Percy designated as the Class Representative (384 F Supp 800, at page 811 and also at 17-2273, Docket #99, Appendix 1, Volume 3, Page 660).

112. The Order certifying the Class in Case 73-cv-04279 is at 17-2273 Docket 97, Appendix 1, Volume 3 of 3, page 640, and the final disposition of Case 73-cv-04279 is at Docket 97, Appendix 1, Volume 3 of 3, page 740, respectively.

113. Percy v. Brennan Case 73-cv-04279 sought and was granted relief as affirmative action for apprenticeship to develop skills and equal employment opportunity.

114. The issues adjudicated by the Court's February 24, 1975 Order in Case 73-cv-04279, Docket #99, Appendix 1, Volume 3, page 728 in 17-2273 and are enforceable under the doctrine of collateral estoppel with respect to the preclusive effect asserted in this action of the Memorandum/Order of November 8, 1974. Plaintiff Percy Class is entitled to a declaration that the Defendants are precluded under the doctrine of collateral estoppel, from denying the standing and relief for enforcement of EO 11246.

115.  This action, grounded on the record in US SDNY Case 73-cv-04279 and related laws and regulations identified in Percy v. Brennan 73-cv-04279, is now relied on for certifying the Percy Class, thereby determining the issue of standing in favor of the Percy Class. The issues adjudicated by the Court's February 24, 1975 Order in Case 73-cv-04279, Docket #99, Appendix 1, Volume 3, page 728 in 17-2273 are enforceable under the doctrine of collateral estoppel with respect to the preclusive effect asserted in this action of the Memorandum/Order of November 8, 1974.

116. Under the doctrine of collateral estoppel of the Court's February 24, 1975 Order in Case 73-cv-04279, Docket #99, Appendix 1, Volume 3, page 728, and by Appeal 17-2273, this plenary action enforces the Memorandum Order of Judge Lasker of November 8, 1974 entered by the Court's February 24, 1975 Order.

117. The title of Case 73-cv-04279 has changed pursuant to FRAP 43(c)(2) by order of the Second Circuit Court of Appeals to reflect the changed parties, which was done at Docket #96-104 in 17-2273, replacing public officials where a new person has succeeded them in office.

## IX.    PRIOR RECORD, CLASS STANDING
## X.    PERCY, THE APPRENTICE that never was

118. Percy speaks here in the first person describing the unfairness and depravity as personal, suffering serious, permanent and irreparable economic and social injury and damage as a result of the actions and/or inactions of the Defendants in not developing less onerous and less offensive

28

alternatives for hiring persons than the disparagement of selection by color of their skin or ethnicity, when all this does is cause an employer to disregard qualifications and competency and instead select employees on an illegal basis of goals for society's outcasts. This illegal disparate treatment is personal and permanent. Percy's circumstances are common and prevalent to the all the members of the Class.

119. Percy retained the Kernan Professional Group, LLP to represent the Percy Class. James Kernan, substituting for Dennis R. Yeager Esq., now deceased, who was Plaintiff's appearing counsel in the original Percy Action.

120. The members of the Percy Class have been and are ready, willing and able to work, persistently wanting to work, but have been constantly deprived and denied work, awakening the crisis on behalf of the Percy Class attempting to obtain work, and damaging the families of the members of the Percy Class, their children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a job, in an amount to be determined at trial.

121. In Percy's words when retaining Kernan to pursue what was awarded to him and the Percy Class:

122. Percy asked why he never became The Apprentice? "I waited, faithfully, expecting that the relief awarded by the United States District Court would happen any day and I would be apprenticed, but days turned into weeks turned into months and then years, while I waited."

"What I seek is what was awarded to me. I'm not blaming anyone mind you, I have gone on for years knowing something is wrong, it's as if there is a strange disease that appears to affect black men. You begin to wonder about yourself, but I stupidly lived on in an urban community where forces of disengagement are more formidable than the resources for battling. Now, I finally have my courage up and seek to regain the relief against Secretary Brennan and the government awarded to me and the class I represent by Judge Lasker."

"The lack of action by the Defendant Government Agencies has gone on for years, something is wrong. You begin to wonder about yourself."

"What do you do when they have the control? I must shake off the

29

disappointment and come up for air from the sewer of life so many of us have lived in, where for me it was actual." There is a stench in the air, much like when he worked for the wastewater plant. "I know that from that stench comes a cleansed and renewed flow, fundamental to health, survival, growth & development and opportunity. I have made a decision to push on. My greatest social crime is I've stayed quiet and laid low, waiting for word."

"I started out with my share of optimism, believing in hard work with a world of infinite possibilities. I remember my start was in the oil fields of Trinidad as a casual laborer. The job training was working alongside an experienced craft person who was able and willing to transfer their know-how to inexperienced, although enthusiastic, people like me. I was beginning to pick up work as a teenager with Halliburton Industries and its local presence with Tucker. I was an assistant to a drill rig operator as a casual laborer roughneck. I also worked as an auto mechanic, using the tools of the trade, often times under challenging conditions without modern vehicle lifts or pneumatic tools, repairing engines, clutches and breaks alongside an experienced mechanic. When it came time to repair broken metal I was taught to weld learning how to draw a bead, fuse welding rods to adjacent metal pieces with the heat of electric arc, and joining dissimilar metals by brazing."

"When I arrived in New York City in April 1966, I registered for the draft at 42nd Street in New York City. I was inducted into the United States Army at Whitehall Street in New York City in July 1966 and shipped to US Army boot camp at Fort Jackson SC. I reported to Fort Bragg, NC for Advanced Infantry Training. I served in the U.S. Army from 1966 to 1968, during the Vietnam era, rising from Spec E4 to the rank of Sergeant E5, providing leadership training to 2nd Lieutenants from West Point OCS and ROTC at Fort Knox, KY to prepare them for the war zone."

"After my honorable discharge from the United States Army on July 21, 1972, I took a job with J.P. Morgan Chase Bank as a transaction clerk. But I was young and was looking for more physical work so I took a New York City wide exam and was hired on with the New York City Sanitation Department as a mechanic at the Center of Repair Services in Maspeth, New York. I took a further examination and was promoted to Senior Auto

30

Worker. I then took the oiler examination and was hired at the 26th Ward Wastewater Treatment Plant and began working as an oiler which was the beginning of my career in the sanitation and water pollution plants. At the 26th Ward, I was promoted to the position of Stationary Electrical Engineer and worked under supervisor Walter Boritz and later under Superintendent Garibaldi. I then became the chief Oiler at the North River Water Pollution Control Plant, making sure the plant was maintained and removed pollutants from used water before being discharged into local New York City waterways."

123. Percy's service extended for 25 years working in sewer plant facilities with pumps and electrical gear as an Oiler, as a Stationary Electrical Engineer at the 26th Ward Pollution Plant, and as an Oiler at Coney Island Pollution Plant, Owls Head Pollution Control Plant, and North River Water Pollution Control Plant.

"North River sticks with me the most where I saved the life of my coworker, Brian Malunat, from drowning in a 15 foot deep sewage influent vat. I remember Malunat shouting ""I am sinking"". With over 9 feet to the bottom, the filth and human waste was filling his boots pulling him under and toward the 6 foot grinder blades where all of the influent and Malunat would be ground into small pieces. He was hanging onto the firehose that he fell in with. He said: ""Percy, please help me, don't let me die this way"", indeed a grizzly death it would have been if he had not been rescued. I put in a ladder and went into the vat, Malunat grabbed me around the neck and I climbed out of the vat with Malunat on my back, laid him on the deck surrounding the vat, hosed him off and took him to the hospital. I took care of my coworkers, workplace safety is so important." The incident was reported in the Daily News and Percy received a commendation from the Commissioner of the New York City Department of Environmental Protection for the rescue at the North River Water Pollution Control Plant, for saving the life of his coworker:

February 6, 1989
Al Percy
North River Water Pollution Control Plant

31

Department of Environmental Protection
135th Street and 12th Ave.
New York, New York
Dear Mr. Percy:

     I want to extend a belated thank you and congratulate you for your fine display of courage and intelligence as you saved the life of your co-worker Brian Malunat.

     You demonstrated tremendous presence of mind in handling the situation as you did. I am very pleased to know that the Department of Environmental Protection has in its employ a committed and exemplary worker such as yourself. Not only does DEP benefit from this sort of outstanding behavior as a whole, but your fellow workers are clearly very fortunate to have you amongst them.

     Thank you for your ongoing commitment to the work at DEP and for your willingness to go the extra mile for a fellow employee.

     Sincerely,
     HARVEY W. SCHULTZ
     Commissioner
cc: Asst. Commissioner Edward Wagner
Louis Tazzi

124. Grateful that he found work and it was meaningful work at the water pollution treatment plants he worked at the barrier and interface between modern industrial, manufacturing, commercial and residential society and its waste and excrement, and our planet, its natural resources and its waterways. "My difficult and dirty chores in excrement stenched confines, shoveling and mopping terrible wastes was so that only clean water, a continuous and life sustaining resource, returned to nature, right back into the environment and into the homes of the living. I worked through the dusty air at the facilities, at times feeling as though I was mentally drowning in the waste flooded bowels of the city of New York, produced by upstream living. I've anguished on why I hadn't simply left and since I remained and waited, why I had not done something to assert myself?"

125. Percy was not promoted, remaining like underground vermin, making a daily descent into the working bowels of the city, the river of slime.

126. Everyone is connected to the steady flow into the sewers and equally connected to the outflow of cleansed water running out. And while society stands (or sits) unaware, on both ends of the input and output, there is an unseen constant interface which keeps the flow between modern society and our planet moving, people like Percy. Percy is of the machinery that allows urban modern living to coexist with the natural elements of our world, earth and nature. The ever-evolving purification of water increased the life expectancy and elimination of many diseases at its beginning and helped create and grow cities and industries.

127. Throw in the plum bob to the sewer tanks and it will scarcely reach bottom. There will always be a dark swirling pool of the wastes of society to which everyone, whether they realize it or not, is connected - by the device called a toilet.

128. Percy is what society relies upon! And yet "I kept my eyes lowered, mumbling, pardon me, pardon me," all the while in the many years that he waited for the promised apprenticeship." Waited, insignificant and yet part of something so significant.

129. Percy never got what he was promised. In 1974 in his landmark Percy Action he won the right for unskilled workers to receive apprenticeship training so they could benefit from good jobs while enjoying the pride that comes from building and maintaining critical infrastructure. Skills are the key to freedom and liberty. Despite a favorable ruling, the apprenticeship never happened. "I speak for the Class, we were denied."

130. The trade that Percy sought to apprentice in was a heavy equipment, operating engineer. When he sought apprenticeship training as a heavy equipment operator he was directed to a Mr. Daniel Murphy who was associated with the New York City Building Trades Association. Murphy advised him to look into becoming an apprentice, but with no success.

131. Since the decision of Judge Lasker in the Percy Action, there has been virtually no meaningful training, no equal employment opportunity envisioned by President Lyndon Johnson upon the signing of the Civil Rights Act of 1964 and the adoption of Presidential EO 11246.

132. In the Percy Action, Percy sought to be admitted into the apprenticeship program for himself together with the thousands of persons identified by Judge Lasker in 1974 as the Class.

133. The training that the Class was and is seeking is apprenticeship involving paid on-the-job training coupled with related classroom instruction.

134. "I am still trapped in my own black skin", Percy said and asked why in all these years, apprenticeship envisioned by Abraham Lincoln did not come to pass. Percy was forgotten, Percy said: "all I was looking for is to gain the skills to be able to compete for jobs, not be given jobs for which I was not qualified." Percy and his class are the apprentices that never happened, apprenticeship that Lincoln envision on April 11, 1865. What happened?

135. Percy asked why did he never become The Apprentice? "I waited, faithfully, expecting that the relief awarded by the United States District Court would happen, any day I would be apprenticed, but days turned into weeks turned into months and then years, while I waited." Now, at the close of Percy's days, he seeks the relief for the class, yes, a new generation, but with the same entitlement to apprenticeship, the award is now enforced here. "Even though my skin is black, I would rather be free to compete for jobs based on my skills rather than the special treatment because of color of my skin or ethnicity."

136. The low-income circumstances in the geographic area surrounding the facilities and projects as enumerated as the tag-along cases, places the Percy Class members at such a low level because they have been constricted to the low income neighborhood in which their families live. The economic circumstances compel children to leave school at an early age in order to help sustain themselves and the family, where fathers who are unable to provide for their families have left in order to maximize public assistance to family members, forcing uneducated children into illegal jobs such as selling drugs just to survive, who only coincidently happen to be black. These low income economic circumstances tie them to the Percy Class members and other families in the neighborhood, denying them the opportunities they seek for which this action has been brought. These dire economic circumstances can persist for generations, damaging the very fabric of the Class, their families and their neighborhoods.

34

137. Equal opportunity at its core carries the simple mandate that opportunities should be open to all on the basis of competence alone. The complaint is that the Percy Class has not been afforded the minimum training and preparation needed to be eligible for the jobs that become available, and those who do secure work as a result of hiring goals are often unable to keep their jobs due to lack of skills.

138. The facts set forth herein are typical of the members of the Class Percy embodies, the hardscrabble Class members who are deprived of the opportunity to become fully employed as a skilled craftsperson simply desiring the dignity of work.

139. The Percy Class are the people outside of the headlines, the invisible people that only get noticed when the lights go out, when the water ceases to flow, when the trains stop, when the sewers back up or when the roads and bridges crumble. They are the workforce that ensure society does not come to a halt. And as much as society relies on them, their challenges in securing the skills necessary have gone ignored.

140. This skills deficit is most notable in communities in which chronic unemployment is most prevalent. These are also the communities most likely to embrace and benefit from the types of jobs that keep society functioning. The skills they lack are the impediment to moving them from chronic unemployment to gainful employment, and also crossing the skills deficit divide.

141. Since the discontinuance of Percy v. Brennan Case 73-cv-04279, there has been virtually no meaningful correction of skill deficits envisioned by President Lyndon Johnson upon the adoption of Presidential EO 11246, which continues to date as boilerplate in all public contracts.

142. Despite Federal Funding poured into Owners for decades, large clusters of the members of the Percy Class are unemployed, unskilled, poor and disenfranchised in communities surrounded by the very public works projects for whom the Federal Funding was intended to assist. The same disproportionate distribution exists for other measures of economic, social and educational disadvantage. All told, the same small number of Community Districts continue to experience multiple, overlapping

35

conditions of distress. These entrenched neighborhood pockets continue to prove resistant to superficial reform efforts, which fail to combine ongoing training, support services, and a credible pathway to employment. In the methodology described below, Community Districts are ranked according to their combined score of disadvantage based upon each Community District's measures of: a. Unemployment, b. Poverty, c. Public Assistance, d. Low Income, e. No High School Degree, f. Prison Admissions.

143. [Eric] Statistical evidence demonstrates that social and economic disadvantage has continued to grow worse in disadvantaged communities across the country since the enactment of Civil Rights Act of 1964 amended in 1991, and EO 11246 in 1965, which have tried levelling the playing field economically for the neighborhoods. These legal initiatives as implemented in practice have failed to produce a reduction in disadvantage as measured by unemployment rates in these neighborhoods. In 1954, 9.9 percent of African-Americans were unemployed. By 2013 that had increased to 13.4 percent (Bureau of Labor Statistics from Pew Research Center). The failure is further evident in our research which shows high levels of unemployment, incarceration , poverty and low levels of education in densely populated minority areas.

144. While the Black unemployment rate in 2013 was 13.4%, the white unemployment rate was half that, 6.7%, a 2-to-1 gap, which has persisted more or less over the last 60 years (Bureau of Labor Statistics from Pew Research Center). According to the Pew Research Center, ". . . labor economists, sociologists and other researchers have offered many explanations for the persistent 2-to-1 gap . . . from differing industrial distribution of blacks and whites to a 'skills gap' between them . . ." The disproportionate disadvantage in educational attainment and employment are certainly consistent with the presumption of a skills gap. Additional conditions of disadvantage such as poverty, dependence on public assistance, and criminal justice system involvement in these neighborhoods suggest that without persistent, concerted, and targeted intervention in the education, skills development, training and employment of these residents, these debilitating conditions are unlikely to be relieved nor fulfill the vision of the Civil Rights Act.

36

145. Further exacerbating the inequity, automation and new technology are combining to raise the level of unemployment resulting in less and less opportunity for the lower or nonskilled class.

146. Percy became the Chief Oiler at the North River Water Pollution Control Plant, making sure the plant was maintained and removed pollutants from used water before being discharged into local New York City waterways. As an oiler Percy's main job was to oil machinery and check engine equipment for leaks or malfunctions, lubricate moving parts, and check gauges, notably for sewage, lighting, air conditioning, and water systems.

147. This was an important job that required an advanced skill set, a skill set to allow Percy to handle the tasks at the plant and ensure the average New Yorker could enjoy potable water. Without the proper skills, Percy would not achieve his career success. This skill set was not developed in the United States, however, but in the oilfields of Trinidad and Tobago. The unfortunate truth is that the United States does not make the effort to train its own citizens to handle its critical infrastructure needs. Yet Percy is an example of the level of success and responsibility that is achievable when one does have the skill set.

148. Today Percy, the Class Representative in a lawsuit commenced years ago, wants to make sure apprenticeship exists to develop skilled workers to care for the infrastructure and systems that the people of the United States of America rely on. There will always be a need for skilled workers capable of keeping society's infrastructure functioning. This cannot happen without the skilled, salt of the earth, labor of hardworking Americans. Percy is leading the charge so that hard working Americans have access to the skills necessary and the good paying jobs needed to keep the machinery running which manages and protects our Earth. Percy is proof of what is possible. But nothing is possible without the proper training and safety.

149. In the landmark class action lawsuit, Percy v. Brennan, Percy won the right for unskilled workers to receive apprenticeship so they may benefit from good jobs while enjoying the pride that comes from building and maintaining critical infrastructure. Despite a favorable ruling, the apprenticeship never materialized and today the United States of America faces a shortage of skilled labor and unacceptable income disparity, low

wages, few fringe benefits, minimal levels of training, and the lack of a career ladder, all contributing to a chronic workforce shortage. If the apprenticeship promised 47 years ago had occurred, people who need jobs today would have rewarding and good paying jobs. Percy was hoping to train the next generation of workers. The Associated Builders and Contractors has stated that the industry is in need of half a million workers today and even more in the future. They further note the need to expand upon current apprenticeship methods that have left us with a worker shortage.

150. Percy and the Percy Class are intended beneficiaries of the contracts and Federal Funding described herein, as provided for by the Civil Rights Act of 1964, 49 CFR 21, 49 CFR 23, and 49 CFR 26, as well as EO 11246. The wrongful and improper violation of the law by the Defendant Government Agencies, Owners and Employers create barriers which cannot be allowed to continue when the real and ultimate result is permanent irreparable serious damage to a class protected as intended beneficiaries under contracts.

151. Percy as a member of the Class is a proper representative of the Class. His personal and business interests and the claims hereinafter set forth are fully aligned with those of the Class.

152. In the Memorandum Decision on November 8, 1974 in Percy v. Brennan, Judge Lasker addressed the plight of the Percy Class. The Percy Class was defined by Judge Lasker as "all black and Spanish-surnamed persons who are capable of performing, or capable of learning to perform, construction work, and who wish to perform construction . . . .", and that is Plaintiff Percy Class and Percy is the Class representative. The standing was certified in Percy v. Brennan.

## XI.   ALTERNATIVE EMPLOYMENT PRACTICE

### The Advocates

153. Carl Evans with Irving Hurdle, Webster Gillory, Walter Fauntroy, Roger Edmunds, Anthony Robinson, and Lynette Barnhardt, along with James M. Kernan as Percy's counsel (referred to hereinafter as the "Advocates"), comprise a team which sought unsuccessfully to have the Defendant Government Agencies and Owners require the Percy Class be employed

under an Alternative Employment Practice at the facilities listed as Tag-Along cases at paragraph 235 - 238 of this Complaint. The members of the Percy Class are ready, willing and able to work, all to no avail because the Defendant Government Agencies, Owners and Employers have denied the Percy Class, frustrating the Alternative Employment Practice, failing to enforce EO 11246 and the mandates of the 1964 Civil Rights Act 42 U.S.C. §2000(e) and §2000(d) (1964) (the "Civil Rights Act"). The Civil Rights Act and EO 11246 are material conditions of contracts, as important an element of the contracts as providing steel for a bridge. The purpose of this litigation is not related to goals for minority employment inclusion. Instead there is a fundamental responsibility on the part of the Government Agencies, Owners and their agents to enforce the provisions of the Civil Rights Act and EO 11246 for the benefit of the Percy Class as third-party beneficiaries, incorporated into agreements as conditions to in contracts.

154. The Advocates when explaining the Alternative Employment Practice as hereinafter detailed, presented statistics that lower socioeconomic communities such as the Percy Class face disproportionate negative exposure to market conditions that result from a long-term and discernible lack of fair and equal access to the skills and markets that result in employment. Coincidentally, disproportionate number of blacks among the disenfranchised remains a huge racial justice problem that has existed for the multiple generations separating African Americans in the United States. The Class from disadvantaged neighborhoods have been continually kept of of the major trades, which is not just a relic of past discriminatory practices, but the continuation of present-day conspiracy of separation and consistent poverty that leads to major health concerns and quality of life issues.

**The Percy Program Presented by the Advocates as an Alternative Employment Practice under 42 USC 2000 e-2(k)(1)(A)(ii) and (k)(1)(C) meets the burden of production and persuasion under Title VII of the Civil Rights Act.**

155. All employment is required to be covered by workers' compensation. Along with the payment of benefits to cover injury and death while on-the-job ("OJT") as required in under New York Workers' Compensation Law §10, workers' compensation can include risk-management, safety training and

loss control. Using workers' compensation coverage as the delivery method for the Alternative Employment Practice to provide apprenticeship for new hires and continuing education for existing employees, is the most efficacious practice of providing skills to educate workers to competently and safely perform work, protect themselves and people with whom they come into contact, by changing employment practices, by adopting the Alternative Employment Practice to be a part of workers' compensation coverage, coverage existing over all employment. The Advocates of the Percy Program have presented to Defendant Government Agencies, and to Owners, and Employers and their agents, the Percy Program as the Alternative Employment Practice. The Percy Program is part of workers' compensation coverage as a mandated coverage required by the Employers, so there is no extra cost to the Employer.

156. The Percy Program is ideally suited to train and create jobs for the Class of disadvantaged persons. The Apprentice Program of the Percy Program is an outgrowth of a commitment to minimize loss and risk in the workplace by educating and training apprentices and journeypersons on safe and healthful practices. Workers' safety is impacted in a positive manner resulting in greater control of risk reducing loss for employers and their insurance carriers.

157. An acceptable apprenticeship program is vigorous and comprehensive and takes many years for an apprentice to fulfill the requirements as established by the US Bureau of Apprenticeship Training and the New York State Department of Labor by means of approved work processes as Appendix A On-the-job training and Appendix B related classroom instruction.

158. The Percy Program first presented to the U.S. Department of Labor Employment Standards Administration in 1984, as an apprenticeship program for Wage and Hour Davis-Bacon purposes as qualifying under the US Department of Labor Bureau of Apprenticeship Training 29 C.F.R. Subt. A, Pt. 29 and Pt. 30, and yet the Owners have been ambivalent regarding encouraging an Alternative Employment Practice which actually provides jobs and careers to the Percy Class, all the while the Percy Class is ready, willing and able to work, and worse yet, damaging the families of the members of the Percy Class, their children growing up in poverty,

significantly disadvantaged in education and skills, struggling to get a job, in an amount to be determined at trial..

159. The Advocates explained the transformational changes taking place in every industry, tradespersons are requested to keep abreast of technological developments, regardless of age or position in an organization – this has never been more important and represents a powerful key to unlock equal employment. This is an opportunity to give disadvantaged persons the skills to compete and make them desirable to hire based upon their capabilities rather than the color of their skin or ethnicity. This is not accomplished by the swipe of a pen or a provision in a contract. Instead it will take time to infuse the skill and training to give naturally intelligent and industrious persons wanting to improve their lives and allow them to move out of poverty into middle class opportunity, this is just good business. Yet, the Government Defendants and Owner agencies, have spent over 40 years attempting to enforce goals which have miserably failed to create skills to compete for jobs, and well they should fail because the goals flow from a forced interpretation of the vision of the Civil Rights Act and the 14th Amendment to the US Constitution - equal protection. The goals are just plain contrary to law and it is obvious that the illegal activity has caused very little good.

160. The Advocates explained that there is a significant difference between OJT and education or apprenticeship. In order to succeed in today's world of nearly instantaneous and constant technological change, it is important to have both, and to ensure that the Class receives the best training and education. It's the only way to stay on top today, while preparing for, and building, for tomorrow.

161. The Advocates explained that OJT is distinguished from education. OJT teaches and education provides tools to continually adapt to changes. An ancient truism says that if you give a man a fish, you feed him for a day, and if you teach a man to fish, you feed him for life. We go a step further: don't just teach how to catch a fish, educate about the art and science of fishing. Go beyond the mechanics of catching a fish and enlighten by explaining the biological forces underlying the key elements of fishing. Give the big picture. Teach the reasons behind the design of the equipment. Teach about water

41

currents, patterns in fish mating and feeding cycles, including economic and environmental trends that impact the life-cycles of fish.

162. The Advocates explained that this clichéd old saw about the fishermen illustrates the divide between apprenticeship on-the-job (OJT) and education. OJT is skill-oriented: it is learning how to fish. Education is concept-based — it is learning to see the big picture of why and how things work together. Both are necessary but without OJT the Percy Class never gains the experience to get a job and cannot get a job due to lack of experience.

163. The Advocates explained that training someone to do something is task-oriented, it is skill-based. You can train someone to increase their proficiency. A trained person is faster, better able to perform tasks competently and safely. OJT has a skill-based focus training people for performance, educating people for understanding. OJT takes full advantage of the new tools and systems coming onto the market by manufacturers.

164. The Advocates explained that OJT is the not only a less onerous alternative, it is the most beneficial and constitutionally acceptable alternative, and is just good business.

165. The Alternative Employment Practice is the "Percy Program" described here at **XI. ALTERNATIVE EMPLOYMENT PRACTICE**" paragraphs 153 – 218, **(XVI. THE PERCY PROGRAM,** paragraphs 241 – 274, **XVII. COMPONENTS OF PERCY PROGRAM** paragraphs 275 – 276, **XVIII. REGULATORY APPROVALS OF PERCY PROGRAM** paragraph 277 – 280 of this Complaint, the subject of this Complaint.

166. The Percy Program as an Alternative Employment Practice was registered with the New York State Department of Labor effective January 1, 1991, and approved by the New York State Department of Insurance on December 6, 1994, registration and approvals which remain intact.

167. The Percy Program was offered as an Alternative Employment Practice by the Advocates, as hereinafter set forth, on behalf of the Percy Class as the complaining party under 42 U.S.C. §2000e–2(k)(1)(A)(ii), and is the required demonstration set forth at subparagraph (k)(1)(C).

168. The Percy Program as an Alternative Employment Practice answers the need for affirmative action to assist the Percy Class in obtaining competitive skills by utilizing registered apprenticeship meeting the requirements of the Fitzgerald Act (29 U.S.C. § 50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Office of Apprenticeship and Training (BAT) and 29 C.F.R, Subt. A, Pt. 29 and Pt. 30. Apprenticeship is the process of learning a skilled occupation through both on-the-job training (practical, paid experience) and learning the related technical knowledge in a classroom. Candidates must be 18 years old, and possess a GED (the Percy Program will help a candidate obtain a GED). Enrollment must be done openly under the procedures established by federal and state regulations for Minimum Qualifications Review and Eligibility List Ranking using: educational achievement, work experience, seniority, job aptitude, oral interview, and general demographic inquiries to determine a score for ranking for eligibility to be enrolled in OJT and continuing education.

169. The Percy Program as an Alternative Employment Practice develops the skills of the class of persons recruited from within communities mired in poverty, the Percy Class, ready, willing and able to compete for paid OJT with related classroom instruction and continuing education provided as part of risk management, loss control and safety training by the Alternative Employment Practice.

170. Providing apprenticeship as proposed by the Percy Program and enrolling the new workforce to work alongside existing journeypersons will grow the depth of skilled workers ready, willing and able to work, whose ranks are being diminished through age and attrition. Disadvantaged persons are given an opportunity, and employers build a reliable workforce, to complete contracts competently and profitably.

171. The 1991 amendment to the Civil Rights Act of 1964 (42 U.S.C. §§2000e et al, commonly referred to as PL Title VII of the Civil Rights Act of 1964 as amended in 1991) set forth a methodology whereby the Percy Class has demonstrated to the Government, Owner and Employer Defendants in this Action, an Alternative Employment Practice to address the disparate impact of the lack of skills, low wages, few fringe benefits, minimal levels of training,

and the lack of a career ladder contributing to a chronic workforce shortage caused by inadequate training of persons in the Percy Class so as to have equal employment opportunity by possessing the necessary skills to compete for jobs.

**The Percy Program is a Less Discriminatory Alternative Method of Employment Practice Available to these Employers and Presented it the Defendant US Department of Labor and the Executive Branch Office of the President of the United States**

172. The Advocates, on behalf of the Percy Class, complained and demonstrated the Alternative Employment Practice to the Executive Branch Office of the President on March 31, 2011, to Rohm Emanuel when he was Chief of Staff for President Barack Obama, and to Eric Holder when he was the United States Attorney General, and to Hilda L. Solis when she was the United States Secretary of Labor, and to other Secretaries of federal government agencies, such as the United States Department of Transportation and the local and state government agencies to whom federal funds were provided for public work facilities. The Advocates submitted the Alternative Employment Practice in submissions for Homeless Veterans' Reintegration Program (HVRP) National Technical Assistance Center Cooperative Agreement(s) and meeting the burdens of production and persuasion for the Alternative Employment Practice. Then on June 29, 2010 the Advocates submitted again the Alternative Employment Practice, when the Advocates on behalf of the Percy Class applied to assist the USDOL Homeless Veteran Reintegration and Veterans Workforce Investment Programs DOL Homeless Veteran and the DOL Homeless Veteran Reintegration and Veterans Workforce Investment Programs for Incarcerated Veterans Transition Program.

173. The Percy Program as an Alternative Employment Practice was first presented to the U.S. Department of Labor Employment Standards Administration for review in 1984 and was accepted on June 14, 1984 as an apprenticeship program under the National Apprenticeship Act of 1937 for as qualifying under the US Department of Labor Bureau of Apprenticeship Training, meeting the requirement of (k)(1)(C) that the demonstrated Alternative Employment Practice of subparagraph (A)(ii) is "in accordance

44

with the law as it existed on June 4, 1989, with respect to the concept of
"" "alternative employment practice" "", 42 USC 2000e-2(k)(1)(A)(ii) and
(k)(1)(C).

174. Even with disadvantaged business enterprises, systematic racial
discrimination existing in the surety bonding of business enterprises who
are qualified to perform public works projects, encounter this disparate
impact due to pervasive and persistent institutional discrimination placing
the Percy Class ready, willing and able to work, at a disadvantage in
financing procurement, capital acquisition, obtaining experience and
competency to safely perform work, all of which are programs intended to
be aided by the Federal Funding. This can be addressed and also be used to
develop enterprises which will provide jobs to the Percy Class using bonding
of disadvantaged business enterprises under the Percy Program presented
to Defendant Government Agencies.

**The Percy Program Presented to the NYS Empire State Development
Corporation is an Available Less Discriminatory Alternative Method
of Employment Practice**

175. The Advocates presented the Alternative Employment Practice to Empire
State Development Corporation (ESDC) director and the Deputy
Commissioner for Community Economic Development, for presentation to
Gov. Andrew Cuomo as evidence to produce and persuade the ESDC to
mandate the Alternative Employment Practice but the ESDC has remained
apathetic to the Alternative Employment Practice and the Class ready,
willing and able to work, and have not taken effective steps to correct the
disparate treatment to the Class.

**The Percy Program Presented to the Port Authority of New
York/New Jersey is an Available Less Discriminatory Alternative
Method of Employment Practice**

176. The Advocates presented the Alternative Employment Practice to Lash
Green, Diversity Officer of the Port Authority of New York and New Jersey,
and to past Executive Director Chris Ward as evidence to produce and
persuade them to mandate the Alternative Employment Practice but they
have remained apathetic to the Alternative Employment Practice and the

Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

**The Percy Program Presented to the Metropolitan Transportation Authority is an Available Less Discriminatory Alternative Method of Employment Practice**

177. The Advocates presented the Alternative Employment Practice to Michael J. Garner, Chief Diversity Officer of the Metropolitan Transportation Authority (MTA), as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

**The Percy Program Presented to the New York Dormitory Authority is an Available Less Discriminatory Alternative Method of Employment Practice**

178. The Advocates presented the Alternative Employment Practice to New York Dormitory Authority (DASNY) Diversity Officer Paul Williams, as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

**The Percy Program Presented to the School Construction Authority is an Available Less Discriminatory Alternative Method of Employment Practice**

179. The Advocates presented the Alternative Employment Practice to School Construction Authority through Thacher & Associates proposing that the School Construction Authority (SCA) and MTA as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

46

## The Percy Program Presented to the State University of New York is an Available Less Discriminatory Alternative Method of Employment Practice

180. The Advocates presented the Alternative Employment Practice to Chairman Carl McCall of the State University of New York for presentation to state Government Agencies for the State University of New York to partner with us to provide the Alternative Employment Practice, as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

## The Percy Program Presented to the City Of New York and its Agencies is an Available Less Discriminatory Alternative Method of Employment Practice

181. The Advocates presented the Percy Program as an Alternative Employment Practice to New York City Government for presentation to City government agencies for the City of New York to provide the Alternative Employment Practice, as evidence to produce and persuade them to mandate the Alternative Employment Practice but they have remained apathetic to the Alternative Employment Practice and the Class ready, willing and able to work, and have not taken effective steps to correct the disparate treatment to the Class.

## Percy Class as Third-Party Beneficiaries of Contracts

182. Owners, as the recipients of Federal Funding from the United States of America, have accepted Federal Funding pursuant to terms and conditions that Owners must certify that it will legally, financially, and otherwise require the Employers to employ these funds to accomplish affirmative action in equal employment opportunity for the economic benefit of the Percy Class.

183. The Defendants and Owners have simply passed the affirmative action obligations through to Employer/contractors with goals for percentage of minority business enterprise participation, goals which in fact violate United States EO 11246, the Civil Rights Act of 1964 and the US

47

Constitution, as well violating several other federal regulations, regulations specifically identified in contracts involving Federal Funding, outlawing preferring persons based upon race, color or creed, causing and continuing to cause disparate impact discrimination, wrongs that these statutes, orders, and regulations were designed to remedy.

184. The Defendant Employers must adopt the Alternative Employment Practice under the Fitzgerald Act (29 U.S.C. § 50 commonly known as the National Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Bureau of Apprenticeship and Training (BAT) and 29 C.F.R. Subt. A, Pt. 29 and Pt. 30 as an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs, 42 USC §§ 2000e–2(k)(1)(A)(ii) and (C).

185. The 1991 amendments to 42 USC § 2000e-2 (Title VII of the Civil Rights Act of 1964) is the same remedy the Percy Class sought in Case 73-cv-04279, was training and is seeking apprenticeship involving on-the-job-training ("OJT") coupled with related classroom instruction under the National Apprenticeship of 1937 ("the Fitzgerald Act"). . The members of the Percy Class are ready, willing and able to work.

186. The State has interfered and continues to obstruct the mandates of EO 11246 as well as failing to abide by the Civil Rights Act of 1964, and specifically the 1991 amendment 42 USC § 2000e-2 and 42 USC § 2000d, and in breach of the conditions to contracts regarding funds from the United States of America, and of rights secured by the United States Constitution Amendments V, XIV, and 42 USC §§ 1981, 1983 and 1985.

187. The Alternative Employment Practice under the Fitzgerald Act of 1937 satisfies the requirement that the Alternative Employment Practice be in accordance with law as it existed on June 4, 1989 as set forth at 42 U.S.C. § 2000e–2(k)(1)(C).

188. The chain of funding, begins with Federal congressional appropriation, then to the Executive Office of Budget & Management allocation, then to the Executive Cabinet Agencies, then to government agencies who distribute the funds, and finally to the local, state and federal agencies and authorities as Owners. Owners enter into agreements to receive Federal Funding, and then

contract with Employers who are paid from the Federal Funding. The Defendant Government Agencies, Owners and Employers as stewards of the Federal Funding, are required to live up to the intent of the Civil Rights Act relating to the adoption of this Alternative Employment Practice.

189. Community Benefits Agreements (CBAs) and Project Labor Agreements (PLAs), which were expected to generate jobs to low-income neighborhoods, and spark economic development were touted as a groundbreaking to ensure the community as well as the developer would benefit from federally funded projects. CBAs and PLAs promised, among other things, that jobs would be set aside for minorities and women and that at least 20% of the money spent on construction would go to minority firms and to level the playing field for companies owned by veterans, women, and other minorities, have failed to alleviate the disparate impact visited upon the Percy Class. The CBAs and PLAs have been a dismal disappointment.

190. The Alternative Employment Practice asserted here is covered under and is a part of workers' compensation coverage empowering disadvantaged persons to gain skills to enter the workforce at a level of skill and training which will permit them to rapidly move towards journeyperson status.

191. The Alternative Employment Practice does not require government subsidies to pay for itself, it is paid for by savings generated by savings to workers' compensation coverage managed and committed to on-the-job training, safety, technology education, risk management and loss control to reward the value of hard work.

192. Upgrading skills allows a disadvantaged person ready, willing and able to work, to compete based upon skill rather than the color of their skin or ethnicity, the vision of 42 U.S.C. §§ 2000(e)-2(a), is lawful affirmative-action and equal employment opportunity. Fewer young people are entering the skilled trades, employers are struggling to find enough skilled workers to undertake the massive infrastructure projects which are sorely needed. With an expected workforce shortage of craft professionals and service members projected to leave the military over the next five years, it is the "Percy Program" as the Alternative Employment Practice.

49

193. Workers' compensation coverage is the framework for providing the Percy Program as an Alternative Employment Practice, providing the apprenticeship through safety, risk management in workers' compensation coverage and enrolling the new workforce to work alongside existing journeypersons, will grow the depth of skilled workers whose ranks are being diminished through age and attrition. Disadvantaged persons ready, willing and able to work, are given an opportunity and employers build a reliable workforce to complete contracts competently and profitably. This workers' compensation based program delivers diversity opportunities. The key is having broad work processes available for meaningful long-term opportunities for all aspects of skilled craftsmanship available on large multi-disciplined contracted project facilities.

194. Workers' compensation insurance is a required part of all employment and is an ideal mechanism within which to fit OJT apprentice training so as to foster equal employment opportunity.

195. The Percy Program as an Alternative Employment Practice can be funded by savings workers' compensation costs resulting loss control and safety training, and safe work habits without costing Owners or Employers or diverting any of the funding for the public work facilities. This is accomplished by simply applying savings resulting from reduced losses due to the Percy Program and allocating those savings to pay for apprenticeship out of the premium paid for workers' compensation coverage.

196. The apprenticeship program portion of the Percy Program as the Alternative Employment Practice is ideally suited to train and create jobs for the Class as identified by Judge Lasker in Percy v. Brennan. The Apprentice Program as the Alternative Employment Practice is an outgrowth of a commitment to minimize loss and risk in the work place by educating and training apprentices and journeypersons on safe and healthful practices, workers' safety is impacted in a positive manner resulting in greater control of risk reducing loss for employers and their carriers.

197. Written assessment and performance verification will implement career pathways created and endorsed by both industry and education, perfect for service members with construction training and/or experience who are interested in taking the assessments.

50

198. The most beneficial and constitutionally correct solution that is certainly a less onerous alternative to address and correct the inequity and foster equal employment is for the Owners to require that the Employers provide paid OJT and continuing education for those ready, willing and able to work, as agreed by the Employer Contractors in compliance with EO 11246. The Owners are not relieved from their obligations under the Civil Rights Act and EO 11246 by passing the burden through to Employer/contractors.

199. Although there is some positive benefit of identifying disadvantaged business enterprises to be entitled to special treatment, the 14th amendment does not permit that to occur, based upon race, color, or creed, either positively or negatively. Minority business enterprise goals have been corrupting and evil, propagating fraud and criminal activity, ***but that is not complained of in this action***. Goals being used under the guise of fostering disadvantaged business enterprises thereby satisfying affirmative action for equal employment opportunity, has been accepted apparently due to the view that by allowing unequal treatment based upon the color of skin or ethnicity under the guise of equalizing opportunity, that is okay in leveling the playing field? ***Again, that is not within this Action***. This proceeding is not to challenge that mechanism, but rather to enable the Alternative Employment Practice identified in the Lincoln Reconstruction Speech of April 11, 1865, namely: apprenticeship for freed people.

200. The Defendant Government Agencies, Owners and Employers have failed to provide a mechanism which enables disenfranchised persons ready and able to work, to gain experience on-the-job and join the gainfully employed workforce.

201. The Defendant Government Agencies, Owners and Employers have conspired, obfuscated, shirked and otherwise simply delegated the responsibility for the enforcement of these regulations, which protect the Percy Class.

202. The Advocates explained that the Class is ready and able to work, has consistently been deprived of the opportunity to obtain employment at the facilities and projects which receive Federal Funding.

203. In depriving the Percy Class the equal opportunity, the Employers have covered up by the use of some minority business enterprise contractors only as fronts in order to appear to satisfy the contract requirements of hiring the identified minority and disadvantaged, failing to place the Percy Class on a level playing field and depriving the Class of vast numbers of real employment opportunities.

204. The Defendant Employers must sustain a very heavy burden of justification to show that there are no less onerous alternatives for achieving the purpose of affirmative action in equal employment opportunity, and yet to exacerbate this inaction, the Government Agencies have intentionally or unwittingly provided support and comfort to others yet to be identified and not named at this time, who have interfered and obstructed the Percy Program.

205. The proof will show that the State has actively supported, comforted and aided scoundrels who have taken improper advantage of the Percy Program, undermining the unique qualities and subverting the Percy Program to the scoundrels' selfish and illegal purposes, undermining the viability of the Percy Program, injuring the Percy Class's efforts to obtain by self-help the relief for which it sued Case 73-cv-04279.

206. The Percy Class ready and able to work, is a proper party to invoke judicial resolution of the dispute. This is not a suit merely for the ventilation of public grievances, there is injury-in-fact as set forth here as damages for lost wages and lost opportunity along with prospective equitable relief enjoining the Defendants from undermining the Percy Program, and mandating adoption of the Alternative Employment Practice..

207. This plenary action is brought by Percy on behalf of Class Plaintiffs, to enforce the Memorandum/Order and Order and settlement in the lawsuit by Percy seeking relief as affirmative action for apprenticeship to develop skills and equal employment opportunity enforcing the Civil Rights Act and LBJs Presidential EO 11246, still on the books and written into all contracts involving Federal Funding.

208. This Action is to require affirmative action by providing Apprenticeship Training pursuant Fitzgerald Act (29 U.S.C. § 50, the National

Apprenticeship Act of 1937, section 1 (29 U.S.C. 50) under U.S. Department of Labor's Bureau of Apprenticeship and Training (BAT) and 29 C.F.R. Subt. A, Pt. 29 and Pt. 30 and as may be delegated by the US Department of Labor Bureau of apprenticeship training and complies with the following New York State Department of Labor regulations: Equal Employment Opportunity in Apprenticeship Training (Part 600), Regulations Governing the Registration of Apprenticeship Programs and Agreements (Part 601), and Labor Law, Apprenticeship Training (Article 23), under the authority of EO 11246, restraints which EO 11246 requires of the recipients of Federal Funding.

209. 40 U.S.C. § 486(a) is the source of the Executive power to issue EO 11246, authorizing the President to prescribe such policies and directives as he deems necessary to effectuate the provisions of Chapter 10 of Title 40.21 and Chapter 4 of Title41. 22, chapters dealing with procurement of Government property and services, not limited to federal assistance programs. The federal government has a vital interest in assuring that the largest possible pool of qualified manpower be available for the accomplishment of federally assisted projects.

210. Discrimination in employment affects the cost and the progress of projects in which the federal government has both financial and completion interests.

211. 42 U.S.C. § 2000e-5(g) imposes no restraint upon the measures which the President may require of the beneficiaries of Federal Funding where discrimination would adversely affect cost and progress of federally funded projects. The strong federal interest in ensuring that the cost and progress of these projects were not adversely affected by an artificial restriction of the labor pool caused by discriminatory lack of skilled craftsmen in employment practices, federal procurement acts provide constitutional authorization for application of EO 11246, providing the nexus between the efficiency and economic criteria of the federal procurement acts.

212. EO 11246 acts to protect the federal government's financial interest in the federal and state projects thereby establishing the sufficiently close nexus sought by the Supreme Court in Fullilove v. Klutznick, 448 U.S. 448, 100 S. Ct. 2758, 2785-90, 65 L. Ed. 2d 902 (1980), where application of EO 11246

must be reasonably related to the Procurement Act's purpose of ensuring efficiency and economy in government procurement in order to lie within the statutory grant of power.

213. The exercise of quasi-legislative authority by the President in his departments and agencies is rooted in a grant of legislative power by the Congress, Chrysler Corp. v. Brown, 441 U.S. at 304, 99 S. Ct. at 1719 U.S. and lies reasonably within the contemplation of that grant of authority, Id. at 306, 99 S. Ct. at 1720, resting upon the close nexus between the Procurement Act's criteria of efficiency and economy and the executive order's predominant objective of containing procurement costs. When the Congress authorizes an appropriation for a program of federal assistance, and authorizes the Executive branch to implement the program by arranging for assistance to specific projects, in the absence of specific statutory regulations it must be deemed to have granted to the President a general authority to act for the protection of federal interests, including all federal procurement contracts and also all federally assisted contracts. In direct procurement the federal government has a vital interest in assuring that the largest possible pool of qualified manpower be available for the accomplishment of its projects. It has the identical interest with respect to federally assisted projects.

214. In Case 73-cv-04279, Percy sought apprenticeship to obtain skills to enable members of the Percy Class to compete for employment. In Case 73-cv-04279, Defendants had a full and fair opportunity in Case 73-cv-04279 to litigate the issue of the enforcement of EO 11246 requiring that affirmative-action be taken to provide apprenticeship to develop skills and equal employment opportunity.

215. The Percy Class has been injured by the Defendant Government Agencies, Owners and Employers violating and continuing to violate the Memorandum/Order and Order by failing to implement regulations and laws.

216. For all of the federal dollars poured into public work projects and facilities over these past forty-five years since the decision of Judge Lasker in Percy v. Brennan 73 Civ. 4279, 384 F.Supp. 800 (1974), there has been virtually no meaningful training, enabling the equal employment opportunity

54

envisioned by President Lyndon Johnson upon the signing of the Civil Rights Act of 1964 and the adoption of the Presidential EO 11246.

217. Parties who would oppose this action should not fear a threat because training the Percy Class in skills and safety will not take jobs, instead it will create economic opportunities which does not currently exist by utilizing the free enterprise wealth of our nation, its labor, to fix its infrastructure of all sorts, which is so desperately needed. Workers are the real wealth of our country, the labor-theory of value. Wealth increases by the output of labor, not by the amount of money or capital accumulated. The greatest physical wealth results from the greatest utilization of our vast diverse workforce, the liberty and freedom of all individuals to work, save, buy, earn at their pleasure, and economic life would settle into a natural order and productivity would thrive [12].

218. These are the necessary elements of a prima facie cause of action for violation of 42 U.S.C. §§2000e et al, depriving rights secured to the Percy Class as the Complaining Party by the 5th and 14th Amendments to the United States Constitution, 42 U.S.C. §§§ 1981, 1983, 1985, and United States EO 11246.

## XII.   DEFENDANT GOVERNOR OF THE STATE OF NEW YORK AND DEFENDANT STATE OFFERED A SETTLEMENT OF PERCY V. BRENNAN IN CASE 73-CV-04279 THAT IS UNENFORCEABLE AND FAILED

219. In January of 1977 the Defendant State of New York presented to the Lasker Court, Governor Carey's Executive Order 45 (9 NYCRR 3.45) in settlement to resolve the issues raised in the Case 73-cv-04279, Docket #99, Appendix 1, Volume 3 pages 749-757, 758-785, 786, 795 and Docket #103, Appendix 2, Volume 4, pages 823, 851 and 860 in 17-2273.

220. Thereupon, Case 73-cv-04279 was closed without prejudice, Judge Edelstein's Order of May 4, 1977, page 740 of Appendix 1 at Docket #99 in 17-2273.

---

[12] It is that free competition and equal employment opportunity that is the wealth of the United States of America, Adam Smith, in the Wealth of Nations, studied and emulated by Jefferson and the Franklin over two centuries ago

221. Then the New York Court of Appeals in *Fullilove v Carey* (48 NY2d 826 [1979]) declared that EO 45 (9 NYCRR 3.45) as promulgated by Governor Carey was an unauthorized exercise of legislative power, illegal and unconstitutional and enjoined implementation of the provisions of said Executive Order or promulgating or enforcing any rules and regulations issued pursuant to said EO 45. Decided together with Fullilove v Carey, was *Fullilove v Beame* (48 NY2d 376 [1979]), where the Court of Appeals of the State of New York determined that despite the redeeming social needed for the relief which EO 45 intended, would not save the illegality of the method to provide the opportunity for the Percy Class to acquire necessary skills to compete for employment, *see Fullilove*, 48 NY2d 826). Unfortunately, EO 45 was and is unconstitutional and unenforceable, causing the Percy Class to not receive the relief provided for in EO 45.

222. Despite the illegality of EO 45, it still remains today at *9 NCRRNY 3.45,* with no notification having been made to the Percy Class of its unconstitutionality and unenforceability.

223. The State's actions or failure to act, and failure to notify, were gross negligence and active misrepresentation, causing injury and damage to the Percy Class when the State proffered EO 45 in settlement of Case 73-cv-04279, but it failed.

224. There is an ongoing obligation of the State to notify and correct the misrepresentation about EO 45. What is flagrantly missing from Appendices 1 and 2 is any record that the Percy Class was notified of the unconstitutionality and unenforceability of EO 45 which was proffered in settlement of Case 73-cv-04279 regarding affirmative action, in other words the settlement failed.

## Defendant State and its Agencies, Actively Undermine the Percy Program

225. The Plaintiff will produce evidence to persuade and show that the State has, in fact, interfered with the Percy Program's ability to provide affirmative action in equal employment opportunity, despite the redeeming value of allowing the Percy Program as an Alternative Employment Practice demonstrated to the State to meets the burden of production and persuasion

under Title VII of the Civil Rights Act by the Advocates on behalf of the Percy Class.

226. The State and the Government Agencies are failing to effectively foster affirmative action, and in fact, the State has no meaningful affirmative action program at all. The State should have allowed a vehicle to provide affirmative action where none exists.

227. The Advocates presented the Percy Program as an Alternative Employment Practice to Governor David Patterson, at a meeting arranged by Clemmie Harris, proposing that the State of New York adopt and mandate the Alternative Employment Practice but the State of New York has remained apathetic to the plight of the Percy Class and has not taken effective steps to correct the disparate treatment to the Percy Class, especially where, as here, the State in concert with others yet to be identified in fact have taken active steps to put the Percy Program out of business

228. Failure to notify the Percy Class, covering up, hiding and secreting the State's failure to accomplish the affirmative action relief awarded in Case 73-cv-04279, whether negligently or intentionally, and then taking overt steps to eliminate the Percy Program, is all to the damage of the Percy Class.

### XIII.   DEFENDANT OFFICE OF FEDERAL CONTRACT COMPLIANCE ("OFCC") OF USDOL FAILS IN ITS RESPONSIBILITY OF DISCHARGING THE FUNCTIONS OF USDOL UNDER EO 11246

229. OFCC is the agency within the U.S. Department of Labor responsible for enforcing equal employment opportunity laws and affirmative action plan requirements against companies have utilized Federal Funding.

230. Contracts require Owners and Employers to comply with all federal laws, regulations, executive orders, policies, guidelines, and requirements applicable to the acceptance and use of Federal Funding including but not limited to: the Civil Rights Act, Executive Order 11246, 49 CFR Part 21-Discrimination in Federally-assisted Programs and Effectuation of the Act.

231. EO 11246 seeks to implement the anti-discrimination program of the Civil Rights Act. EO 11246 binds the Employers and the Owners. Section 202(1) of the EO provides: The contractor will take affirmative action to ensure

equal employment opportunity. Such action shall include but not be limited to the following: employment upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship, 30 Fed. Reg. 12,319 (1965), the "color blind" approach envisioned in E.O. 11246.

232. Section 202(1) of EO 11246, 30 Fed. Reg. 12,319(1965), provides that: The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that ready, willing and able applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include but not be limited to the following: employment upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

233. As a result of the Defendant OFCC's failure enforce EO 11246 terms of contracts to accept the Alternative Employment Practice or to otherwise comply with the employment of the Percy Class, has damaged the Percy Class by continuing chronic injury and damage to the Percy Class ready, willing and able to work, , and damaging the families of the members of the Percy Class, their children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a job, deprivation of opportunity, including members of the Percy Classes' children growing up in poverty, significantly disadvantaged in education and skills, struggling to get a jobs reported on analysis by Cadora in 2nd Circuit Appeal 17-2273, Docket #104, Appendix 3, pages 39-57.

234. The Defendant Government Agencies are charged with enforcing EO 11246 as contractual conditions to Federal Funding for public work facilities, therefore they are equally culpable with Owners and Employers identified in the tag-along causes of action for the lost wages, lost benefits and lost opportunity to which the Percy Class is entitled as third-party beneficiary.

## XIV.   CAUSES OF ACTION AGAINST EMPLOYERS

235. Work by Employers paid for by Federal Funding is analyzed as tag-along causes of actions to this lead action.

236. The five Counties of the City of New York are ground zero for the Percy Plan as the Alternative Employment Practice. Tag-along causes of actions may be updated from time to time as the boundaries and limitations are investigated and expanded. As the investigation presently stands, in public work construction in the five Counties of the City of New York alone, in the since 2017, there have been 1787 public work projects identified here as tag-along cases, on which there were 16,077 apprenticeable opportunities that did not occur for the Percy Class, denying the Percy Class:

> $894,488,139 wages, and

> $782,677,122 employment benefits, for a total of

> $1,677,165,261 direct damage to the Percy Class for lost wages and benefits.

237. Individual Causes of Action in each proposed tag-along case detail the number of apprentice positions that should have been filled resulting in lost wages listed by Employer.

## Defendant Employers have Violated and Continue to Violate 42 U.S.C. §2000e−2(k)(1)(A)(ii) and 2(k)(1)(C)

238. The Defendant Employers have used unlawful employment practices of discrimination on grounds that the Plaintiff is able to meet its burden of production and persuasion proving that there was a less discriminatory alternative method of employment practice available that the Employer could have adopted. Failing to adopt the alternative employment practice without valid justification is an unlawful employment practice violating 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (k)(1)(C) of the Civil Rights Act of 1964 as amended in 1991, and as a result the Court is warranted in providing relief to the complaining party Percy Class.

## XV.   JURISDICTION AND VENUE

239. This action asks for equitable relief along with monetary relief in the tag-along actions exceeding the monetary jurisdiction of any inferior courts.

This Court's general jurisdiction covers violations of these laws, statutes, executive orders, regulations, rules, federal agreements and covenants to which persons such as the Percy Class are intended third-party beneficiaries, a dispute within the jurisdiction of this Court.

240. Venue in this Court is proper because a substantial part of the events giving rise to the claims made herein occurred in and about the City of New York.

## XVI.    THE PERCY PROGRAM

## History of Apprenticeship in the Percy Program

241. The Percy Program was developed with the assistance of predecessors of Defendant State DFS officers: former Chief Deputy Frank Donohue, and former General Counsel Morty Greenspan, who worked tirelessly to shepherd the development of the Percy Program. Oriska's singular mix of tools provides training and working environments that exists nowhere else. Such rich benefits under the Percy Program results in retention of well trained, competent and safety conscious workers for employers who participate in the Percy Program.

242. It happens that 90% of the persons accessing the Percy Program have been minority or disadvantaged by natural selection, meaning that the disadvantaged have a difficult time being accepted into organized labor OJT apprenticeship programs. The Percy Program can work with unions utilizing union journeypersons for OJT apprenticeship of Percy apprentices, providing jobs to union members and apprentices, benefiting all.

243. The Percy Program begun in 1984, and for 25 years has provided apprenticeship to hundreds in the skilled trades. The Percy Program moved from upstate New York to the Bronx in 1999 to accomplish the same substantial and permanent good that was accomplished upstate.

244. In 1998, Percy, through Oriska, began the Apprenticeship Programs in the New York City area at SUNY Maritime College in the Bronx. The Percy Apprentice Training Program is an integral part of Percy's safety training and loss control for Workers' Compensation insurance coverage and Employee Benefit insurance coverages designed specifically to comply with prevailing wage and supplement benefit requirements for the construction industry. The related classroom instruction part of apprenticeship training

60

was designed to comply with requirements of the New York State Departments of Labor and Education. Since 1999, the Percy Program, in partnership with State University of New York Maritime College ("SUNY Maritime"), has trained skilled trade persons through the OJT Apprentice Program.

245. The Percy Program works under the delegation of authority by the Federal Bureau of Apprenticeship Training to the NYS Departments of Education and Labor. The Percy Program works under the guidance, authorization and regulation of the New York State Departments of Education and Labor.

246. Workers' safety is affected positively utilizing the Percy Program, resulting in greater control of risk, reducing loss for employers and injuries and illnesses to employees, through instruction in safe and healthful practices.

247. The length of apprenticeship varies from two to five years, depending on the occupation. The Program works especially well in public works construction where the federal Davis-Bacon law and the NYS Labor Law Article 8 keep wages in the skilled trades high. The apprentice is paid a percentage of the journeyperson rate while in apprenticeship as part of the workforce working under the guidance of more experienced workers called journeypersons.

248. Successful completion of all requirements results in award of a NYS Department of Labor Certificate recognized by the Federal Bureau of Apprenticeship Training verifying journeyperson competency.

**Worker Assessment**

249. All workers undergo a complete series of entry- and journey-level assessments as part of the Percy Program. These assessments evaluate the knowledge of an individual and provide a prescription for upgrade training when needed. All assessments are based upon curriculum developed in conjunction with subject matter prevalent in the covered industry. The assessment and certification are in compliance with existing federal, state and local employment laws.

250. Management assessment tests assess an individual's skill level. Performance verifications are administered by a qualified objective performance evaluator.

## Hazards in the Workplace OSHA Application

251. Occupational Safety and Health Act of 1970 Section 5(a)(1), "General Duties Clause", recognizes hazards in the workplace that are causing or are likely to cause death or serious physical harm, including from airborne infectious diseases. Mitigation is by engineering and administrative controls, and by safe work practices.

• Personal protective equipment (PPE, including goggles, face mask, gowns) as may be necessary, to assist medications, including IV, oxygen monitoring, and administration of bathing, personal care in hospitalization, home health care and nursing home settings.

• Engineering controls include mechanical methods of separating an employee from a workplace danger, air filtration systems or physical barriers, sneeze guards.

• Administrative controls changing human behavior to reduce exposure to a hazard, encouraging sick employees to stay home, keep workers six feet apart from each other and reducing unnecessary travel to locations with coronavirus outbreaks.

• Safe work practices provide disinfecting products so employees can clean their work surfaces.

• Working in personal protective equipment (PPE) including masks, gloves, hard hats, eye protection and respirators, nurse working triage in hospitals.

• Apprentices and journeyperson employees will receive various work experiences listed below (customized to the needs of specific employers, local requirements and specific care settings). The apprentice will learn and practice the competencies working with a mentor on the work site.

• Each Apprentice(s) and journeyperson employee must be instructed in safe and healthful work practices and shall ensure that apprentice(s) are trained in facilities and other environments in cleaning, decontamination & disinfection, area specific safety standards, OSHA/blood borne pathogens, microbiology, mold, viruses, bacteria (e.g. cross contamination, chain of infection, microbial transmission, how CS supports infection prevention),

where to obtain area specific safety awareness standards (e.g. safety data sheets (SDS)) by regulatory agencies & professional associations).

252. Work areas covered include decontamination, correct cleaning agent or chemicals for cleaning process, supplies needed (e.g. brush, towels, location of restock):

• equipment (e.g. washer disinfector, ultrasonic, cart washer, leak tester), determine & prepare chemicals following the manufacturer's IFU (e.g. dilution, equipment), check & replenish chemicals in equipment, determine the correct chemicals for the equipment, testing the functionality of light & magnification devices, clean sink strainer/drains (e.g. frequency), quality tests, efficacy testing process for washer/disinfector, efficacy testing process for ultrasonic, efficacy testing process for automated endoscope reprocessor (AER),

• efficacy testing process for cart washer, frequency of quality tests (e.g. washers, ultrasonic, AERs, cart washers), document & interpret quality test results (e.g. quality assurance testing program), maintenance & troubleshooting of equipment, interpret the manufacturer's IFU (e.g. operator's manual, locate), identify, respond & report malfunctions and/or alarms, clean equipment strainers/drains, Identification of outlets (e.g. on/off, regular, emergency), chemical feed line functionality (e.g. identifying detergent dosage), clean & test spray arms, check washer manifolds & baskets, identification & separation of reusable & disposable items, sorting reusable & disposable items (e.g. laparoscopic tips, linens, drapes, third-party recycling vendors, sustainability), dispose of sharps & non-reprocessed items (e.g. biohazards vs non-regulated trash, sharps container), preparing items for decontamination, identify manual and/or mechanical cleaning according to the manufacturer,

• proper opening & positioning of instruments, disassemble instruments, what goes in each sink (e.g. two or three sink method), soak process (e.g. water temperature, dilution), brushes (e.g. selection, size & care, single use vs reusable), prevention of aerosols,

• use of high-pressure water & air gun/hose (e.g. critical water), visual inspection of bioburden removal (e.g. magnifying devices), properly load

items into the equipment, selection of appropriate wash cycle, methods for reducing the risk of toxic anterior segment syndrome (TASS), special precautions for Creutzfeldt-Jacob Disease (CJD) instruments, selecting & using appropriate disinfectant, disinfectant family (e.g. Quats, Halogens, Aldehydes), three levels of Spaulding classification (e.g. non-critical, semi-critical, critical),

•      identifying, selection & use the appropriate chemicals (e.g. exposure times, rinsing), documentation of chemical testing (e.g. temperature, minimum effective concentration(MEC)),

•      correction for failed quality tests (e.g. temperature, MEC), high level disinfection (HLD) process, safety measures when using HLD (e.g. PPE, spill kit, ventilation), dilution requirements (e.g. concentration, expiration, end of use date, labeling),

•      rinsing requirements (e.g. critical water), proper documentation (e.g. technician information, patient information, exposure time & solution temperature, lot control number), are, handling & storage (e.g. drying, expiration date), proper disposal methods (e.g. neutralizer),

•      transporting guidelines (e.g. closed container, clean labeling), transferring items to preparation area, maintain appropriate air flow (e.g. negative pressure, positive pressure), prevent cross-contamination (e.g. point of use cleaning & decontamination prior to IUSS), performing a visual check for cleanliness, preparation & packaging, area specific safety standards, area specific safety awareness (e.g. hot carts, wet floors, hot trays), sharps safety (e.g. skin hooks, k-wire, towel clips), equipment operation (e.g. heat sealers, insulation testers, scope inspectors), where to find Safety Data Sheets (SDS), chemical safety & handling (e.g. interpreting the manufacturer's instructions for use (IFU) & SDS, disposal),

•      ergonomics (e.g. work-flow, proper body mechanics), traffic flow, hand-hygiene, temperature & humidity of the work environment, standards for temperature, standards for humidity, recording & documenting temperature & humidity (e.g. frequency), corrective actions taken if not within parameters (e.g. who to notify), preparing work area for packaging, dress code, supplies needed (e.g. indicators, tip protectors, tray liners, tape),

work area requirements (e.g. cleaning requirements, lighting, magnification), receiving items for preparation, unload equipment (e.g. instrument, cart washers), accept manually cleaned items (e.g. pass-through window), identify & sort items (e.g. service, facility, loaner),

- inspecting items for cleanliness & functionality, check for cleanliness & functionality, proper testing tools & process for checking functionality of items (e.g. sharpness testing), process of handling broken and/or damaged instrumentation (e.g. dull, misaligned, documentation), lubrication of items (e.g. according to the manufacturer's IFU, when & lubricate), assemble, test & disassemble items according to the Manufacturer's IFU, identifying correct contents for assembly, utilizing count sheets, peel pack lists, tray lists, identify items (e.g. catalogs, product number, computers, tape, etching, cross-referencing),

- sizing & measuring items, assembling contents for packaging, instrument protection devices (e.g. tip protectors, foam, mats, tray liners), proper instrument placement (e.g. facilitate sterilization, protect instruments), instrument organizers (e.g. stringers, racks), class/type & appropriate use of chemical indicators/integrators (e.g. proper placement, intended cycle),

- weighing limits & weight distribution, packaging method, types of packaging method (e.g. flat wrap, peel pack, container, size, packaging weight, sterilization method/cycle to be used, external indicators (e.g. locks, tape), inspecting packaging (e.g. wrap, rigid containers),

- closing methods (e.g. tape, locks, heat seal, self-seal, proper packaging methods (e.g. peel packs, rigid containers, wrap (simultaneous vs sequential)), proper wrapping techniques (e.g. square fold, envelope), labeling method, approved writing instrument,

- placing of labeling & writing (e.g. write on plastic side of peel pouch, write on tape not wrapper), proper label information (e.g. missing items, tray information, technician identification, storage destination), special information identifiers (e.g. implant, loaners, sterilization methods/cycle), date of sterilization/date of expiration (e.g. event-related vs time), transferring items to appropriate area, proper item handling (e.g. stacking,

rough handling (sliding), package integrity),

•       prioritizing for rapid turn-around, ergonomics (e.g. workflow, body mechanics), track items (e.g. manual, computer), documentation & record maintenance, record maintenance, record keeping (e.g. policy & procedure, what needs to be kept, type of records, record location, quality test results), purpose of record keeping (e.g. standards, legal documents), environmental condition monitoring & corrective action, appropriate air exchanges & pressures for all work areas, corrective action plan for environmental conditions out of compliance (e.g. temperature, humidity, air flow, regulatory bodies).

253. Covered:

•       sharps safety, equipment operation, chemical safety & handling (e.g. spill kit, interpreting the manufacturer's instructions for use (IFU) & SDS, disposal), Location, operation & testing of eyewash station & shower, ergonomics (e.g. work-flow, proper body mechanics), Traffic flow, contain, transport & receive soiled items into decontamination or soiled utility rooms (e.g. inspecting for & reporting inadequate point of use cleaning), Hand-hygiene (e.g. frequency), Personal Protective Equipment (PPE), what type of PPE to use, donning & doffing PPE, When to change & dispose of PPE, temperature & humidity of the work environment, standards for temperature, standards for humidity, recording & documenting temperature & humidity (e.g. frequency), corrective actions taken if not within the parameters (e.g. who to notify),

•       employee education, safety & risk management, accident/incident reporting policy (e.g. patient tracing procedure, in event of needle stick, cut), orientation (e.g. health care facility, state & federal regulations, disaster plan, risk management & safety management policies), personnel monitoring (e.g. exposure control plan, badges), education & training record requirements (e.g. certification, competencies, continuing education, new equipment & processes),

•       cleaning equipment (e.g. according to the manufacture, drains, chamber), checking equipment functionality (e.g. error codes, printer, incubators), sterilizer tests, leak tests, bowie dick/air removal tests,

biological tests (e.g. high & low temperature, cycle changes), when to perform tests (e.g. repair, construction, malfunction, routine), sterilization methods & cycles, high temperature (e.g. steam, dry heat), low temperature (e.g. gas plasma, vaporized, ethylene oxide, liquid chemical), anatomy & phases of the high & low temperature sterilizers, different types of cycles (e.g. gravity, dynamic, standard, advanced),

• pre & post-sterilization package integrity, what compromises integrity (e.g. moisture, holes, filters, broken locks & seals), filter placement, locks, seals & external indicators, load sterilizer, load configuration (e.g. metal, wrapped, rigid container, peel pouch), sterilization method verification (e.g. high vs low temperature), biological tests/process challenge devices (e.g. selection, placement), identify appropriate use of external indicators (e.g. sterilization method, placement), operating & monitoring sterilization equipment, sterilizer component checks (e.g. according to manufacturer, door gaskets, drains, carts, incubator temperature verification), select & change cycle for high & low temperature sterilizers (e.g. exposure, dry, temperature), replace & dispose of empty cartridges/tanks/cassettes, cycle parameter verification, interpret the printout (e.g. temperature, time & pressure exposure, cycle type),

254. Verification procedures to ensure accountability (e.g. initialing the printout):

• unloading sterilizer, what compromises sterility (e.g. cooling time, temperature, handling, equipment failure), traffic flow (e.g. cart placement), test results, proper handling & incubation of the biological tests/process challenge devices, quarantine (e.g. implants, early release),

• interpreting & document test results, potential process failures, identify a process failure (e.g. wet packs, color change, failure to meet sterilization parameters), procedure for follow-up after process failure (e.g. recall, documentation, contact), load control (lot) number, required information for a load control (lot) number, documenting sterilization load contents, how & what to record (e.g. computer or manual load log sheet), rationale for documentation (e.g. recall, traceability),

• customer relations, customer relations, communication etiquette (e.g.

67

phone, email, text, active listening), decision-making skills (e.g. prioritizing, critical thinking), communication types (e.g. formal, informal, service recovery skills), medical terminology (e.g. anatomy & physiology, surgical terminology, instrumentation), teamwork & work groups, types of work groups (e.g. quality, cross-functional), decision making & accountability (e.g. identify roles & responsibilities), task prioritization (e.g. reading the schedule, turnover, anticipating customer needs),

• sterile storage & inventory management, area specific safety standards, area specific safety awareness (e.g. traffic flow, hand-hygiene, safety data sheets (SDS)), ergonomics (e.g. work-flow, proper body mechanics), temperature & humidity of the work environment, standards for temperature, standards for humidity, recording & documenting temperature & humidity (e.g. frequency), corrective actions taken if not within the parameters (e.g. who to notify),

• preparing the work area for storage, dress code, supplies needed (e.g. carts (closed, open), rack system (closed, semi-closed, open)), work area requirements (e.g. cleaning requirements), ordering & inventory replenishment, inventory replenishment & distribution systems (e.g. periodic automated replenishment, exchange cart system, requisition systems), the ordering process (e.g. computerized vs manual), identify the product (e.g. catalog numbers, item number, descriptions), unit of measure (e.g. each, box, package, case), handle inventory deficiencies (e.g. outages, substitutes, communication),

• receiving & inspecting inventory, proper break-out area (e.g. corrugated cardboard, external shipping containers), inspecting for integrity (e.g. what & when to check), expiration & manufacturing dates (e.g. symbols, what & when to check), stocking & rotating inventory, location of supplies (e.g. shelf/cart location, sterile supplies), shelf life policy (e.g. expiration, event-related), process for rotating inventory (e.g. first in first out (FIFO)), proper storage requirements (e.g. height, weight, distance from wall/floor, shelving),

• distributing sterile & non-sterile items, distribution methods (e.g. just in time, exchange cart, case cart), proper handling of items (e.g. maintain

sterility), transport guidelines (e.g. closed cart, bins, dust covers, off-site transport), monitoring & tracking items distributed, high dollar items, specialty carts (e.g. code carts, emergency carts, c-section), critical items (e.g. special order, non-stock items, doctor specials, patient specific items), vendor-owned items (e.g. loaner, consignment),

• items organization and tracking (e.g. manual, RFID, computerized), distribution to user departments (e.g. ER, OR, clinics, ICU), loss of sterile items, handle manufacturer product recalls, common causes of waste & loss (e.g. damaged, expired & obsolete items), patient care equipment, area specific safety standards, area specific safety awareness (e.g. OSHA/blood borne pathogens,

• personal protective equipment (PPE), electrical safety, hand-hygiene, regulatory agencies & professional associations), equipment operation & interpret the manufacturer's instructions for use (IFU) (e.g. operator's manual), temperature & humidity of the work environment, standards for temperature, standards for humidity, recording & documenting temperature & humidity (e.g. frequency),

• corrective actions taken if not within the parameters (e.g. who to notify), preparing the work area for distribution,

• supplies needed (e.g. sleeves, pads, equipment covers, clean labels/stickers), work area requirements (e.g. cleaning requirements, charging stations, plugs), receiving items for preparation, identifying types of patient care equipment, process for recording & tracking equipment (e.g. rental, loaned), the flow of patient equipment (e.g. one way flow),

• inspecting equipment for cleanliness & functionality, check for cleanliness, check for compliance with safety standards (e.g. frayed cords, preventative maintenance label, damage), corrective action plan for equipment out of compliance (e.g. missing/expired preventative maintenance label, who to notify), equipment requiring charging or battery replacement, preparing equipment for distribution, assemble equipment for distribution (e.g. disposable components, manufacturer test equipment (e.g. per manufacturer), care & handling, location and proper storage of equipment (e.g. dry, clean), distributing & tracking equipment, systems

69

used (e.g. manual, computer, hybrid), record & track distribution of patient care equipment, transport guidelines to end user departments (e.g. or, ed, labor & delivery),

• anatomy for central service technicians, cells, tissues and organs, body systems: skeletal, muscular, nervous, endocrine, reproductive, urinary and excretory, respiratory, digestive, and circulatory, anatomy and instrument names, microbiology for central service technicians, overview of microbiology, beneficial vs. dangerous microorganisms, how microorganisms are identified and classified, controlling and eliminating microorganisms, regulations and standards, regulatory agencies, professional associations, infection prevention, central service processes, principles of asepsis, personal hygiene and attire, managing the environment to manage the spread of bacteria, Occupational Safety and Health Administration (OSHA) 29 CFR 1910.1030,

• environmental concerns in central service areas, elements of transmission and the chain of infection, decontamination; point of use preparation and transport, goals of point-of-use preparation and transport, sources of contaminated items, point-of-use preparation: reasons and guidelines, transport of soiled items, off-site processing, education and training, cleaning and decontamination, introduction to the decontamination work area, mechanical cleaners, equipment testing, cleaning chemicals and lubricants, instructions for use,

• steps in the process of decontamination, decontamination, disinfection, introduction to disinfectants, types of disinfectants, safe work practices when performing manual disinfection, achieving disinfection using mechanical processes, quality assurance for disinfection, quality assurance testing for high-level disinfectants,

• surgical instrumentation, the important role of instrument selection and inspection, instrument manufacturing process, classification and overview of surgical instruments, postoperative care of surgical instruments, solutions that damage instruments, instrument sharpness testing and identification, instrument identification methods, instrument lubrication, tips to protect instruments from damage, complex surgical

instruments,

• power surgical instruments, endoscopes, rigid and semi-rigid endoscopes, rigid and semi-rigid endoscope general guidelines for decontamination, rigid endoscopic instruments, endoscopic and robotic instrumentation, flexible endoscopes, cleaning and processing flexible endoscopes, flexible endoscopic accessories, flexible endoscope regulations and guidelines,

• Infection prevention issues, flexible and rigid endoscope care and handling, endoscope camera care and handling, endoscopic repair,

• staff education, loaner instrumentation, assembly and packaging, assembly and packaging area, primary goal of pack preparation, general guidelines for preparation of pack contents, quality assurance measures - internal chemical indicators, basic packaging procedures, reusable packaging materials, disposable packaging materials, wrapping techniques, methods of packing closure, package labelling, special packaging concerns, point of use processing,

• use of steam sterilization, procedures for immediate use steam sterilization, quality control monitors for immediate use steam sterilization, point-of-use processing for heat-sensitive devices, high-temperature sterilization, factors that impact sterilization, advantages of steam sterilization, anatomy of a steam sterilizer, types of steam sterilizers used in central service, steam sterilizer cycles, conditions necessary for effective steam sterilization, basic work practices for steam sterilization, sterilization quality control, low temperature sterilization, low-temperature basic sterilization requirements, ethylene oxide, hydrogen peroxide systems, ozone sterilization,

• sterile storage and transport, storage considerations, receipt of sterile items into storage, event-related sterility, basic storage guidelines, cleaning, sterile storage professionals, transporting sterile items, transportation guidelines, monitoring and recordkeeping for central service, the importance of accurate records, general monitoring, decontamination area monitoring, high-level disinfection monitoring, sterilization monitoring, sterilizer specific monitoring, personal monitoring, staff education, quality

assurance, quality in central service operations, components of quality, quality control indicators, analysis of quality concerns, quality program alternatives, quality central service procedures, quality in central service processing areas, managing inventory within the central service department,

•      handling commercially-sterilized items, item locator systems, loss of sterile items, transport of commercially-sterilized packages, distribution of supplies, sustainability, the role of central service in inventory management,

•      role of central service in ancillary department support, identifying the central service department's scope of service, patient care equipment, procuring new and additional equipment, other patient care equipment concerns, procedural support, utensils and other medical equipment, communication and coordination is key, the role of information technology in central service, role of computer-based information systems, tracking systems for central service, features of instrument and equipment tracking systems,

•      safety and risk management for central service, risk management, common workplace safety hazards, general hazards, area specific safety concerns, other areas of concern, disaster preparedness, employee accidents and injury, patient accidents and injuries,

•      employee information and training, employee preparedness, success through communication, need for effective communication and human relations skills, common communication barriers, central service technicians are professionals, basics of communication, human relations, central service technicians and teamwork, central service and diversity, customer service skills for central service technicians, setting priorities, avoiding work group comparisons, committing to patient care during disasters, personal and professional development for central service, personal development.

•      standard precautions, and consumer education, apprentice learns about hand washing, using gloves,, and mixing universal solutions, apprentice learns about disposal of wastes, use proper body mechanics at all times and incorporate safe transfer and lifting techniques, is knowledgeable

about procedures in case of emergencies in the home, check equipment before use and notifies supervisor of any problems identified,

255. The Percy Program includes OSHA Certification Training providing health and safety certification programs to reduce occupational errors and promote protective measures, including OSHA classes, first aid, emergency planning, and fire safety, and OSHA's recently released guidance on classification of worker risk to potential exposure to the coronavirus.

256. The Percy Program works closely with employers and their employees, on education/training, consulting with employers and employees on safety, OSHA regulations, hazardous material handling and health safety evaluation, airborne infectious diseases, lead abatement, asbestos blood borne pathogens, mold and other hazardous materials and fire, traffic control, fall protection, trench safety, drilling and blasting safety, hot and cold weld precautions, heavy equipment safety operation, scheduling and working height safety protection, incorporated into teaching programs. The Percy Program includes on-site safety inspections and risk assessment. creating safe work environments necessary to help to control the workplace and increase safety awareness and loss prevention. Loss prevention includes risk evaluation, pre-inspection, of sites includes loss history, nature of risk, safety practices and program compliance recommendations for implementation of safety programs.

## OSHA 10 and 30 Hour Course

257. The 10 and 30 Hour course provides instructions on various industry safety and health standards. It introduces workers to safety standards and makes them able to recognize hazards, avoid dangerous situations and prevent accidents, includes intro to OSHA, fall protection, electricity, personal protective equipment, handling, storage, use and disposal of tools.

## OSHA 10 Confined Space Entry

258. An OSHA 10 Permit is utilized for training to recognize, evaluate, control and abate safety and health hazards associated with permit-required confined space entry. The course focuses on the specific requirements of OSHA 29 CFR 1910.146, recognition of confined space hazards, basic

information about instrumentation used to evaluate atmospheric hazards, and general permit space ventilation techniques.

## OSHA Ergonomics

259. An OSHA ergonomics course covers the use of ergonomic principles to prevent musculoskeletal disorders. Topics include anthropometry, video display terminals, work physiology, musculoskeletal disorders and risk factors such as vibration, temperature, material handling, repetition and lifting and transfers in health care. The course features industrial case studies covering analysis and design of work stations and equipment, laboratory sessions in manual lifting and coverage of current OSHA compliance policies.

## OSHA Excavation, Trenching and Soil Mechanics

260. OHSA standard and on safety aspects of excavation and trenching, practical soil mechanics and its relationship to the stability of shored and un-shored slopes and walls of excavations, various types of shoring (wood timbers and hydraulic) are covered.

## OSHA 7600 Disaster Site Worker

261. participants are made aware of safety and health hazards, including CBRNE agents that may be encountered at a natural or human made disaster site. The importance of respiratory and other personal protective equipment and proper decontamination procedures that may be used to mitigate the hazards are emphasized. Participants support the use of an Incident Command System through the safe performance of their job responsibilities. They will be able to show awareness of effects of traumatic incident stress that can result from working conditions and measures to reduce stress. Participants perform the following specific tasks:1) inspection of an air purifying respirator; 2) donning and doffing of an air purifying respirator; and 3) respirator user seal check; using skilled support services (e.g. utility, demolition, debris removal, or heavy equipment operation) or site cleanup services in response to a disaster.

## OSHA 2225 Respiratory Protection

262. Covers the requirements for the establishment, maintenance, and monitoring of a respirator program, OSHA standards, NIOSH certification and medical evaluation recommendations. Course highlights include laboratories on respirator selection, qualitative fit testing and the use of a large array of respiratory and support equipment for hands on training (Included Respiratory Medical Clearance Test and Respiratory Mask Fit Test)

## OSHA 3110 Fall Arrest Systems

263. Provides participants with an overview of state of the art technology for fall protection and current OSHA requirements, including the principles of fall protection, the components of fall arrest systems, the limitations of fall arrest equipment, and OSHA policies regarding fall protection. Course Objectives: Identify various types of fall protection and their components; Recognize fall hazards and identify abatement methods for fall hazards; Define the proper use of fall protection equipment and personal fall arrest systems and slection of proper standards for citation purposes.

## Fire Safety and Emergency Preparedness

264. The Fire Safety is designed to give a clear understanding of the Fire Code and Fire Rules, the duties of a Fire Safety Manager, the Fire Code construction site requirements, and construction site fire safety requirements, fire alarm systems; emergency procedures; training requirements; fire suppression systems; other building systems; maintenance; recordkeeping and knowledge of rules as they pertain to fire safety.

## American Heart Association First Aid, CPR with AED

265. Procedures for CPR and choking, heart attacks, strokes, Automated External Defibrillator (AED) introduction, as well as topics such as bleeding, shock, fainting, poisoning, epilepsy, diabetic emergencies, allergic reactions, burn accidents, heat and cold emergencies, head and neck injuries, and musculoskeletal injuries, is certified, good for 2 years.

## Enforcement of smoking prohibitions

266. Inspection for accumulation of rubbish, location and use of fire extinguishers, and fire alarm pull stations when required; Information of the extent of the out-of-service condition; location of hazardous materials that are stored, handled or used in the building including fuel oil storage tanks; the means available for the fire guard to make required notification

## Environmental Training Lead - Renovation, Repair and Painting Class

267. The U.S. Environmental Protection Agency (EPA) Renovation, Repair and Painting (RRP) Rule, developed under the Toxic Substances Control Act, imposes requirements for contractors, property Owners and managers, who renovate, repair or prepare surfaces for painting in pre-1978 rental housing or space rented by child care facilities for lead safe work practices, learning lead laws that apply regarding certification and lead safe work practices.

## Mold and Bacteria Remediation

268. Facts associated with mold, interpretation of data and the current general status of mold-related litigation, legislation, licensing, and certification, are covered.

## Blood Borne Pathogens

269. Covered are exposure control plans and workplace practices that will minimize risks, OSHA standard universal precautions, personal protective equipment, safe work practices and engineering controls; decontamination; housekeeping; labels and signs.

## Lead Worker EPA

270. Lead hazard control activities including elevated blood level (EBL), health department ordered projects, USHUD grant programs, public & Indian housing abatement programs and military abatement projects, include: health effects of lead poisoning and sources of lead exposure, testing for lead-based paint, worker protection, abatement, clean-up, clearance testing, disposal of abatement debris, regulation, guidelines and recourses for lead testing and abatement, risk management, hazard control strategies, waste disposal.

## Asbestos Handler

271. Employees on an asbestos project whose duties involve removal, encapsulation, application or enclosure of any asbestos material, or the disturbance of friable asbestos, medical surveillance, personal protective equipment, preparing the working area and setting up the decontamination unit, usage of negative pressure air filters, air monitoring and hazard communication regulations, EPA, OSHA & relevant state & local regulations, New York State Industrial Code Rule (12NYCRR56) and Federal USEPA and USOSHA regulations, waste disposal and recordkeeping requirements, air bulk sampling and glove bag techniques, confirming and minimizing airborne fibers, and on-site safety, are covered.

272. Air Sampling covering air sampling techniques, inspections and procedures, regulations and emergency response, becoming familiar with the methodology for representative quality assurance for both personal and area sampling for phase contrast microscopy (PCM) and transmission electron microscopy analysis (TEM) are included.

## Apprentice Wages

273. Apprentices can be paid a percentage of journeyperson wage. If a wage and benefit determination for the public work construction applies pursuant to section 220 of the New York State Labor Law and the federal Davis–Bacon Act USC 40 U.S.C. §§ 276a-276a-5, re-codified as 40 U.S.C. 3141-3148, the apprentices rate is scheduled.

274. Out of the savings on the apprenticeship wage paid as a percentage of the journeyperson wage, an emolument to journeypersons who undertake, train and mentor the apprentices' OJT, a 10% markup on such journeyperson's wages is available. The journeyperson must be assessed and qualified as a trainer to be eligible for the training emolument.

## XVII.   COMPONENTS OF THE PERCY PROGRAM

275. The Percy Program on which we seek declaratory judgment relief against the Defendant Government Agencies on the enforceability of the Percy Program, includes apprenticeship and health, disability and workers' compensation benefits offered to employers.

The Benefit Program includes the following:

- • Workers' Compensation Insurance
- • Health Insurance
- • New York Statutory Disability Insurance
- • Short-Term Disability
- • Long-Term Disability
- • Contract Bonding, including Bid, Performance and Payment Bonds
- • Apprenticeship under the National Apprenticeship Act of 1937 as approved by the NYSDOL

276. Gaining control of workers' compensation costs is essential. Health care providers under intense pressure from health care programs, find it all too convenient to shift costs to workers' compensation coverage. This can raise the medical cost for any claim by a factor of 100 - 400%. To help alleviate this crushing burden, the Program offers a singularly unique 24-hour protection portfolio jointly administering workers' compensation, health, and disability coverages. Delivery of workers' compensation services and traditional health care reduces costs while providing employees with a simple, state-of-the-art system of health care delivery, combining care for injured and ill workers.

Oriska Insurance is the sole provider of a fully insured 24-Hour Coverage Program of employee benefits (the "24-Hour Coverage Program") offered by Oriska as a domestic New York insurance carrier. The 24-Hour Coverage Program seamlessly provides instant care through a workers' compensation carrier that is also a licensed health carrier, specializing in workers' compensation, health and disability. Oriska is so singularly licensed, licensed for health in its P&C licensing, even though health coverage is normally the purview of a life carrier. This gives Oriska the ability to provide immediate care regardless if the injury is work-related or not in a cost-efficient manner. No other U.S. company is so specially licensed.

The unusual licensing of Oriska for health, disability and workers' compensation insurance within the same carrier enables Oriska to provide

immediate care under its health coverage, returning injured employees to work, avoiding long term worker compensation benefit costs. Employees receive the same medical attention whether the injuries are work or non-work related.

The necessary licenses for the business of accident and health, disability and workers' compensation as specified in paragraphs 3 and 15 of Section 1113(a) of the New York Insurance Law, are required for the loss sensitive 24-Hour Coverage Program. These licenses were granted by the State to Oriska in 1993. The licenses required rating and form approvals by the DFS pursuant to Insurance Law §2307 and were first approved by the DFS for Oriska in 1994, and were revised and ratified in 2003, 2005 and 2007. Oriska's membership in the New York Compensation Insurance Rating Board ("NYCIRB"), credentialed with the New York Workers Compensation Board ("WCB"), recognized by New York State by the issuance of licenses under paragraphs 3 and 15 of Section 1113(a) of the New York Insurance Law, were necessary to legally operate this 24-Hour Coverage Program, intellectual property specifically approved for Oriska's individual use and identity.

This loss sensitive program of 24 hour work-related and non-work related coverage is accomplished by endorsing standard policies to provide coverage offered as a portfolio of coverages with basic required pieces that the insured must agree to take and participate in, a basic program that the insured agrees to by its Adoption Agreement. There are additional coverages that are added to enhance the program as the insured chooses.

The basic coverage is workers' compensation as shown on the Information Page of the Policy.

A first aid emergency treatment, well care coverage rider and preventative care is added for claims which are not immediately accepted as work related in order to provide immediate medical care and treatment. If there is a C2 First Report of Claim alleging a work related incident, the Carrier so notifies the Workers Compensation Board but continues to pay as a non-work-related incident until a claim has been established by decision of the Workers Compensation Board.

In addition, a rider for Enhanced Statutory Disability shall apply for lost wages as an enhancement to supplementing Statutory Disability overage issued by the Carrier or to enhance Disability coverage provided by another carrier [upon renewal of the Program adopted by the Insured, the Carrier shall provide Statutory Disability Coverage at rates in place with another carrier at the time of the initial adoption of the Program, and thereafter at rates calculated by the Carrier for the experience of the Insured. If upon renewal of the Program the insured opts not to purchase its Statutory Disability Coverage from the Carrier, the Carrier has the option to non-renew the Program in its sole discretion].

The Program includes first aid emergency treatment, well care, safety, risk management, loss control, education and continuing education, and apprenticeship. If an insured fails to participate in these aspects of the Program, the Carrier has the option to nonrenewal in its sole discretion.

Oriska reports as a Large Deductible Discount below Standard Premium covering:

- Return to Work Incentive
- Drug Free Work Place
- Scheduled Deductible Credit
- Managed Care
- Work Place Safety
- Apprenticeship
- Premium Discount

The Program coverage is as a trade association covering all of the employees of multiple-coordinated subsidiary policies issued to insureds. The maximum amount that a multiple-coordinated insureds are required to pay is annual standard premium as shown on the Information Page of its policy adjusted by audit, there is no override for the extra benefits provided under the Program.

Assessment (assessments and taxes charged by the State) are paid directly to the State.

From the Annual Premium paid in this loss sensitive Program a deductible premium is retained by Oriska as mutually agreed with the

80

insureds, and the balance paid as a deductible discount to a loss fund to cover actual benefit obligations incurred during the period the Program is in effect, providing an incentive to the insureds to emphasize safety and loss control activities. The deductible discount paid into the Loss Fund are funds that are restricted to the payment of the obligations of the Program as to the time and manner of payment out of the loss fund. When the loss fund balance exceeds 110% of the obligations as defined by the trust, the overage can be distributed as reduction in premium on renewal.

The Program is funded by the flow of revenue from the multiple coordinated policyholders. The Carrier Oriska pays to the Loss Fund consisting of an imprest account and a trust for the reimbursement to Oriska Insurance for obligations of the Program (claim payments, loss adjustment expenses, reserves, safety training and risk management, and Bank and trust fees) to fund the obligations.

All claims of injured or ill employees within the deductible covered under the Program are reimbursed from the Loss Fund either out of the Imprest Account or the Trust administered by the Administrative Trustee.

After the aggregate limit as agreed between the parties the risk belongs to the Oriska.

The 24 HR Program Discount for the loss sensitive program is agreed to by "mutual agreement" on a portfolio of coverages and attributes defined within the Program for managed care, loss control, safety training, risk management, continuing education, first aid emergency treatment, well care, apprenticeship, and aspects of the Program as added from time to time by mutual agreement.

## XVIII.   REGULATORY APPROVALS OF PERCY PROGRAM

277. The following is a summary of the regulatory approvals obtained by Oriska Insurance and Oriska Corporation for the Percy Program.

278. The Apprentice Program was first certified by the New York State Department of Labor and Department of Education in 1990. In 1999 the Apprentice Program moved to the Bronx.

279. The endorsements subsequent to 1994, both by direct approval by the DFS or by adoption of NYCIRB policy endorsements, constitute modifications and/or additions to the 1994 Memorandum which initially detailed the workers' compensation coverage approved by the DFS.

DFS File 93100407-408 Memorandum, November 15, 1994

Approval of Workers Compensation, Accident and Health, and Disability loss sensitive program.

- The Program is offered under Insurance Law 4235, Insurance Law 3443 and Insurance Law 2307.

- Described as a Program of multiple coordinate policies to insureds who have adopted the Program through an Administrative Trustee and have elected coverage through the Program.

- The loss sensitive program endorses standard policies to provide coverage offered as a portfolio of coverages with basic required pieces that the Insured must agree to take and participate in.

- Provides for a Large Deductible Discount.

- The policyholder is the Administrative Trustee or the Professional Employer Organization licensed under Article 31 of the New York Labor Law.

- The maximum amount multiple-coordinated Insured policyholder is obligated to pay Oriska is the full audited Annual Final Premium plus Assessments.

- The Program is funded by the flow of revenue from the multiple-coordinated policyholders. The Annual Premium is divided into two (2) parts, the first is the Deductible Premium as a percentage of Annual Standard Premium which is as mutually agreed and which is retained by Oriska; and the second, the balance is the Deductible Discount to reimburse obligations.

- From the annual premium paid in this loss sensitive program the agreed deductible premium is retained by Oriska as mutually agreed with the Policyholder and the balance paid as a Deductible Discount to a Loss Fund to cover actual Obligations incurred.

- It is not until the balance in the Loss Fund balance exceeds 110% of the coverage Obligations, can there be a return of a portion of annual premium to insureds.

- The Loss Fund consists of an imprest account and a trust for the reimbursement of Oriska for obligations of the Program (claims payments, loss adjustment expenses, reserves, safety training and risk management).

- Oriska requires collateral for the credit risk associated with the Deductible Credit.

1996-09-26; NYCIRB LRRO Mutual Agreement Approval by DFS

- Modification approval to 1994 Memorandum to eliminate the NY Large Risk Rating Option limitations and allow the individual large risk.

- Revised the premium eligibility requirement to estimate annual standard premium in excess of $500,000.

2002-11-02; WC Large Deductible Filing DFS Approval

- This is a significant modification to the 1994 Memorandum. Not only were there major changes to the "Program" per the 1994 Memorandum, File 93100407-408 Memorandum, November 15, 1994, the changes to the 1994 Memorandum were incorporated into a policy endorsement.

- 2003 -02-13; Workers Compensation Large Deductible Plan Filing Approval OIC Final is the Department of Financial Services approval of the policy endorsement significantly modifying the 1994 Memorandum.

- Essentially a changed form Large Risk Rating Option to Workers' Compensation Large Deductible Plan [Deductible Endorsement (WW 99 06 01 (2002)].

- Requires named insured must sign a copy of the endorsement acknowledging responsibility to reimburse the program and confirming he/she understands the possible economic effects of being responsible for loss adjustment expenses.

83

- The Plan is designed as an alternative to self-insurance.
- Provides the Explanatory Memorandum and Operational Rules.
- Solvency of insurer is protected by requiring collateral to secure reimbursement.
- Range of deductible amounts.
- Basis for computing Deductible Premium.
- Allows participation by Professional Employer Organizations.
- Provides underwriting guidelines.
- Deductible Endorsement.
- Establishes each named insured is jointly and severally liable for all deductible amounts under this policy.
- Prototype Trust Agreement to be used in lieu of a letter of credit to satisfy the security requirement in the endorsement for the related credit risk.
- Security of the employees is preserved because insurer has primary responsibility to pay claim liabilities to injured employees.

2003-02-13; Workers Compensation Large Deductible Plan Filing DFS Approval

The DFS approval letter of Endorsement WC 99 06 01 (2002).

2005-02-15 Approval of WC Large Deductible Filing DFS Approval

Large Deductible Program Endorsement approval [WC 99 06 01 B (01/05) NY] was obtained from the Superintendent of Insurance to increase the deductible to the greater of $1 million each occurrence/claim or 200% of audited standard premium.

Amendments as Endorsements to the Policy form were approved as to how the deductible applies, miscellaneous definitions, and provisions for PEOs. A new paragraph I was added on Joint and Several liability.

2007-12-05; NYSID Endorsement DFS Approvals

Approval of Endorsement – WC 31 040 03A and WC 31 06 16A were

84

obtained from the DFS, also approved was Endorsement WC 99 01 01 pertaining to the acceptable calculation of the assessment and premium tax. The revised Professional Employers Organization Deductible Endorsement – WC 99 06 01 C and the Deductible Program Endorsement – WC 99 06 020 were also approved effective 2007.

280. Summary:

Certain provisions in the 1994 Memorandum were superseded and are referenced in the endorsements that were approved by the DFS. It is significant to note that effective 2002, to ensure named insureds give informed consent, the rights and responsibilities of the named insureds are encapsulated in the endorsement which is part of the policy they receive. Use of the endorsement not only ensures insured are informed of critical aspects of the coverage such as the pooling arrangement and joint and several liability caveats, but that they also received the most current terms and conditions. The 2007 endorsement (WC 99 06 020) details the most current rights and responsibilities of the insured and is applicable to the examination period.

The originally approved document, the 1994 Memorandum, still contains relevant administrative information and in particular is the governing document that authorizes the administrative trustee, the creation of a trust and imprest account and details how the multiple coordinated policy coverage works.

## XIX.   NUMEROSITY

281. The number of members of the Percy Class are essentially unenumerable but are not indeterminate as certified in the Percy v. Brennan action Case 73-cv-04279 being enforced here.

282. The Class defined and certified by Judge Lasker, as all black and Spanish surnamed persons residing in and about the City of New York is an extremely large and unwieldy class. To identify the Class, Percy counsel has caused to be sent out long overdue Notices of Settlement as Notices of Enforcement of the Settlement of [Percy v. Brennan Case 73-cv-04279.

283. Percy has sent thousands of letters, had hundreds of telephone calls, sent hundreds of emails in the past months seeking to identify persons who

85

would be the current generation members of the Percy Class, with the instructions for class members to opt-in, so as to identify each as a member of the Percy Class. At the same time, Percy has demonstrated its alternative employment practice to thousands of employers also within the greater New York City business community urging the adoption of the Percy Program in order to enable members of the Percy Class to compete for jobs and careers based on skills and not by skin color, or ethnicity.

284. Included in the mailing was a Notice of Enforcement Action to the Class of enforcement of the Percy v. Brennan Settlement in Case 73-cv-04279 and the Alternative Employment Practice demonstrated to and urged that the Employer Defendants adopt.

285. This identification is to provide specificity of the members of the Percy Class who would be entitled to relief.

## XX.    COMMON ISSUES OF LAW AND FACT

286. The issues of law and fact determining the claims of the Percy Class, that the actions of the Defendant State and its DFS and the Employers named in this action, have caused, are causing, and will continue to cause serious, permanent and irreparable economic and social injury and damage to the Percy Class, are common to all members of the Class.

287. The common issues of law and fact must be determined in order to fashion an appropriate equitable remedy and provide equitable relief for the benefit of the Percy Class.

## XXI.    JUDICIAL ECONOMY

288. This action avoids the prosecution of separate actions by multiplicity of actions involving the same individual members of the Percy Class and the same Owners which would create a likelihood of inconsistent or varying adjudications with respect to individual members of the Percy Class.

289. The Defendant Government Agencies, individually and collectively, alone and in concert with other still unidentified parties, cloaking themselves under the color of law, utilized and are still utilizing all the power of their government offices, in capricious and conspiratorial disregard to deny and to inflict damages on the Percy Class without justification. The Percy Class has been denied and deprived of an opportunity to compete effectively

86

within the American free enterprise system and as a result the members of the Percy Class have sustained serious and ongoing damages, and if the wrongdoing of the Defendants is not enjoined and prevented, the chronic damage will continue unabated.

## XXII.   AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES

290. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

291. Defendant Government Agencies failed the settlement involving New York EO 45 (9 NYCRR 3.45) upon the final and enforceable Memorandum/Order ("Memorandum/Order") of Judge Lasker reported at 384 F Supp 800 of November 8, 1974, settled by agreement accepting Defendant New York State's offer of EO 45, but EO 45 failed, and the Percy Class was never notified (paragraph 89, 219 - 224).

292. The acts of Defendant Government Agencies and each of them have violated the Civil Rights Act of 1964, 42 USCA § 2000e, and d.

293. Plaintiff Percy and the Class he represents have been constantly denied due to such wrongful and illegal acts in violation of the Civil Rights Act of 1964, 42 USCA § 2000e and depriving the Percy Class of opportunity, entitling the Percy Class to actual damages for lost wages, for lost opportunity and compensation as money damages, not limited to members of the Class, but also including members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, damaging the families of the members of the Percy Class, in an amount to be determined at trial.

## XXIII.   AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES

294.  The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

295. The acts of Defendant Government Agencies and each of them have violated of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§§1981, 1983 and 1985.

296. Plaintiff Percy and the Class he represents have been constantly denied due to such wrongful and illegal acts in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§§1981, 1983 and 1985, depriving the Percy Class of opportunity, entitling the Percy Class to actual damages for lost wages, for lost opportunity and compensation as money damages, not limited to members of the Class, but also including members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, damaging the families of the members of the Percy Class, in an amount to be determined at trial.

## XXIV.   AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES

297. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

298. The acts of Defendant Government Agencies and each of them violated EO 11246.

299. Plaintiff Percy and the Class he represents have been constantly denied due to such wrongful and illegal acts in violation of EO 11246, depriving the Percy Class of opportunity, entitling the Percy Class to actual damages for lost wages, for lost opportunity and compensation as money damages, not limited to members of the Class, but also including members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, damaging the families of the members of the Percy Class, in an amount to be determined at trial.

## XXV.   AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES and the OFFICE OF FEDERAL CONTRACT COMPLIANCE

300. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

301. The wrongful and improper violation of the law by the Defendant Government Agencies creates barriers which cannot be allowed to continue when the real and ultimate result is permanent irreparable serious damage to a protected class under the Constitution and federal law and as intended beneficiaries under contracts.

88

302. The Percy Class, as the intended beneficiaries of the Federal Funding described herein, are entitled to an accounting relative to the Defendants' Compliance with Federal Funding described herein, and specifically are entitled to an accounting regarding Defendants' utilization of Federal Funding in compliance with the Civil Rights Act of 1964, 49 CFR 21, 49 CFR 23, and 49 CFR 26, as well as EO 11246.

303. The Percy Class is also entitled to an accounting as to how Defendant Government Agencies calculate both their compliance with these statutes and regulations, and, how they calculate and implement their required "affirmative action" intended for the direct benefit of the Class.

304. The Percy Class requests a full accounting as well as declaratory relief from this Honorable Court that they are entitled to this information, and that the Defendant Government Agencies be ordered to provide the same.

## XXVI.    AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT GOVERNMENT AGENCIES

305. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

306. The Defendant Government Agencies, individually and collectively, jointly and severally conspired and acted to frustrate the efforts of Percy limiting the effectiveness of the Percy Program in its support of the efforts of independent entrepreneurs to provide training to enable the Percy Class to compete for jobs which can lead to rewarding careers providing reliable and steady income and benefits for those workers and their families.

307. As an agency of the State of New York, the DFS is delegated extensive powers from the State government office of the Governor.

308. The State suspended the ability of the Percy Program to write business by wrongfully exercising Insurance Law §1104(c) on June 30, 2004. The State's wrongful suspension of the Percy Program on June 30, 2004 under Section 1104(c) some three years later on June 28, 2007, too little and too late to prevent serious, permanent and irreparable damage to the Percy Program. The State unilaterally lifted the June 30, 2004 Order of Suspension.

309. The DFS then issued an Order under 1310 of the Insurance Law on February 1, 2013 failing to recognize the approvals set forth herein, failing to abide by the Stipulation and Judgment of 2007.

310. Even though the impairment was addressed and cured in 2014, Deputy General Counsel for DFS Martha Lees provided a letter dated February 7, 2019 that policies of the Program were unenforceable pursuant to the 1310 Order still in effect, ignoring that the impairment was cured. Ms. Lees' letter recklessly disregarded the fact that the impairment was cured.  Ms. Lees consciously disregarded the fact that the impairment was addressed and ignored the precedent ratifying the prior accounting practice on these very same policies and insurance, by stating in her letter of February 7, 2019 that the 1310 Order was still in effect. Ms. Lees ignored Judge Julian's Order of 2007 specifically upholding the accounting principles and practices supporting the Program, a practice that provided for payment into a 114 Trust for collateral for the self-insured high deductible loss sensitive Program. The Program submitted by File 93100407 November 15, 1994 was approved by the New York State Department of Insurance on December 8, 1994. The Program is governed by 29 U.S.C. § 1003 of ERISA.

311. Ms. Lees showed further contempt for the Program and the motive of terminating use of the Program, in an affidavit of July 25, 2016 where she admits that she rejects the accounting practices and actuarial computations for the Program This places the benefit liability for the Program into the Property and Liability Insurance Security Fund, Guaranty Fund under N.Y. Ins. Law §7603 (a)(1)(D), even though Supreme Court Justice Robert Julian on the same issues held otherwise in Oneida County Supreme Court case CA2006-001542, where the Program was ratified.

312.  Ms. Lees' further complicity with the Employer Defendants and Lipsius and non-cooperation with the Carrier's counsel Hitzke further demonstrates a conspiracy to liquidate the Carrier, putting it out of business, and place claim liability of the Employer Defendants into the Property and Liability Insurance Security Fund, Guaranty Fund under N.Y. Ins. Law §7603 (a)(1)(D), thereby relieving the Employer Defendants of their liabilities.

313. Special knowledge incorporated into the operation of the Percy Program, is singular to Oriska, and does not exist anywhere else.

314. The State's actions threatens and discriminates against "blacks" and "Spanish-surnamed" persons as the Percy Class by means of regulatory actions and proceedings brought by and at the instance of the Defendant State, were brought in bad faith or were initiated with and animated by motives based on retaliation, harassment, that has the effect of discrimination on the basis of race, national origin or gender, or other illegitimate motives, the State has evidenced an intent going back 20 years where the Defendant State has abused its power attempting to eliminate the Percy Program.

315. The Percy Class suffers and will continue to suffer similar serious, permanent and irreparable economic injury, loss and damage as a result of actions by the Defendants preventing implementation of apprenticeship programs which continue the successful efforts of Oriska Corp and Oriska Insurance in developing and implementing those programs to develop marketable skills among disadvantaged workers on the way to success in a free and openly competitive marketplace.

316. The State, individually and collectively in concert with other still unidentified parties, cloaking themselves with the mantle of public service, utilized and are still utilizing all the power of the State in a malevolent effort to deny opportunities for the Percy Class, due to such wrongful and illegal acts as aforesaid depriving the Percy Class of opportunity, entitling the Percy Class to actual damages for lost wages, for lost opportunity but also including members of the Percy Classes' children and families, significantly disadvantaged in education and skills, struggling to get a job, damaging the families of the members of the Percy Class.

317. Demand is made to enforce the aforementioned Stipulation of accord and settlement and Judgment with the State by directing entry of a decree compelling specific performance of the terms of the Stipulation allowing the Percy Program to operate, and for other and further relief as to the court may seem just and proper to allow the operation of the Percy Program, and enter a declaratory judgment declaring that the acts of the Defendants and each of them to be in violation of the Percy Class' rights to equal employment and enjoin the Defendants and each of them from further violation of such rights, declaring that damages must be stopped and rectified.

91

## XXVII.     AS AND FOR A SIXTH CAUSE OF ACTION AGAINST ORISKA INSURANCE AND ORISKA CORPORATION

318. The Plaintiffs repeat and reiterate the allegations set forth above as though fully set herein.

319. Oriska Insurance and Oriska Corporation have failed and/or neglected to protect the facilities needed to operate the Percy Program, causing the Oriska facilities to become impaired as determined by an order of the Superintendent of Insurance pursuant to Insurance Law 1310, undermining the availability of the singular credentials of Oriska Insurance and Oriska Corporation, affecting the Percy Program as a going enterprise.

320. Wrongful acts of parties not named as defendants, caused the alleged impairment of Oriska Insurance Company and Oriska Corporation in the Complaint by using off-shore reinsurance, reinsurance that the DFS determined did not transfer risk, causing the DFS to disallow the reinsurance, bringing all of the liabilities which had been transferred by others to an off-shore reinsurer back onto the books of Oriska Insurance.

321. The Percy Class seeks an order in the nature of a mandamus enjoining Defendants Oriska Insurance and Oriska Corporation to provide the facilities specifically developed for the Percy Program, the Percy Class having relied to its detriment on Oriska Insurance and Oriska Corporation's ability to deliver the Percy Program as a vehicle for the Alternative Employment Practice.

## XXVIII.     RELIEF

Plaintiff Percy Class prays for:

Issuance of an order permitting this litigation to proceed as a class action as previously certified in Case 73-cv-04279 under Federal Rules of Civil Procedure 23(a) and (b)(3) and order prompt notice to all class members that this litigation is pending;

Declaration that the Defendants are precluded, under the doctrine of collateral estoppel, from denying the standing and class certification by the Memorandum/Order and Order;

Declaration that the Defendants violated and continue to violate the

Memorandum/Order and Order by Defendants having failed to implement the settlement in Case 73-cv-04279 by regulations and executive orders to accomplish EO 11246 and the Memorandum/Order and Order in Case 73-cv-04279, and the settlement in Case 73-cv-04279, for relief affirmatively providing OJT training and related classroom instructions to develop skills and equal employment opportunity, in harmony with the Civil Rights Act of 1964 and as amended in 1991, within the protections of the Fifth and Fourteenth Amendments to the Constitution, 42 U.S.C. § 1981;, and EO 11246,

Declaration that damages must be stopped and rectified;

Award to Plaintiff Percy and the Class he represents actual damages for lost wages, for lost opportunity and compensation as money damages to be determined at trial in this litigation;

Award to Plaintiff Percy and the Class he represents liquidated damages to be determined;

Award to Plaintiff Percy and the Class he represents pre- and post-judgment interest at the statutory rate;

Award to Plaintiff Percy and the class he represents attorneys' fees, costs, and disbursements;

Enforcement of the aforementioned Stipulation of accord and settlement and Judgment with the State by directing entry of a decree compelling specific performance of the terms of the Stipulation allowing the Percy Program to operate and for other and further relief as to the court may seem just and proper to allow the operation of the Percy Program;

Entry of a declaratory judgment declaring that the acts of the Defendants and each of them to be in violation of the Percy Class' rights to equal employment and enjoin the Defendants and each of them from further violation of such rights;

Entry of an order in the nature of a mandamus enjoining Defendants to provide an accounting of their acts;

Entry of an order enjoining any further payment of Federal Funding until Defendants have implemented corrective policies and procedures,

93

conditions, covenants and obligations as asserted in this Complaint so as to prevent the further waste of Federal Funding by officials of the Defendants, and from denying the Percy Class their right to employment in connection with public works contracts through Defendants' continued failure to abide by agreements, covenants, statutes, regulations, executive orders and other federally approved provisions guaranteeing the right to such affirmative action to empower the Percy Class with skills to compete for equal employment, and that Defendants provide an actual accounting providing actual evidence of the apprenticeship of the Class of members of the disenfranchised, and, pray that this Court enjoin any further payment of Federal Funding to Owners and Employers until Defendants have cured the breach of agreements, conditions, covenants and obligations as asserted in this Complaint and have mitigated the ongoing damage to the Percy Class and the waste of Federal Funding by taking remedial action to correct past wrongful conduct;

Entry of an order in the nature of a mandamus enjoining Defendants Oriska Insurance and Oriska Corporation to provide the facilities specifically developed for the Percy Program;

Treating this as a Private Attorney General Action under 42 U.S.C. 1988 insofar as may be necessary to provide the relief requested in this Complaint together with reimbursement of attorneys fees, expert fees, costs and disbursements;

ALL together with such other and further relief as shall seem just and proper under the circumstances.

Dated: June 2, 2020

_____s/_____

KERNAN PROFESSIONAL
GROUP, LLP

26 Broadway, 19th Floor,
New York, New York 10004
Phone:(212) 697-9084
Fax (212) 656-1213
jkernan@kernanllp.com